269 N.J. Super. 11 (1993)
634 A.2d 538
JOSEPH P. ABBAMONT, JR., PLAINTIFF-APPELLANT,
v.
PISCATAWAY TOWNSHIP BOARD OF EDUCATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1993.
Decided November 29, 1993.
*14 Before Judges PETRELLA, CONLEY and VILLANUEVA.
Glen D. Savits argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Mr. Savits, of counsel, and on the brief).
*15 David B. Rubin argued the cause for respondent (Rubin, Rubin, Malgran, Kaplan & Kuhn, attorneys; Mr. Rubin, of counsel and on the brief).
Peter van Schaick argued the cause for amicus curiae New Jersey Employee Lawyers Association (Mr. van Schaick, of counsel and on the letter brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Plaintiff, a non-tenured public school teacher, brought this action against his former employer, defendant Piscataway Township Board of Education, under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. Plaintiff alleged that he was not rehired in retaliation for his complaints about the inadequate ventilation in his shop, which created a hazardous condition that he "reasonably believe[d] ... [was] incompatible with a clear mandate of public policy concerning the public health, safety or welfare." N.J.S.A. 34:19-3c(3). Plaintiff demanded reinstatement and back pay with benefits, attorneys' fees, punitive damages and costs. At trial, the judge reserved decision on defendant's motion to dismiss, but, after a jury verdict in favor of plaintiff for $60,000, granted the motion and dismissed the complaint. Plaintiff's motion for a new trial was denied. Plaintiff appeals. We reverse and remand for a trial solely on punitive damages.
Plaintiff, a certified industrial arts teacher, began teaching metal shop in the Quibbletown Middle School in September 1985. During the prior month, he worked without pay cleaning up his facility because "it was in shambles." Edward McGarigle, the school principal, told plaintiff that he was to teach small engines and metals. However, plaintiff believed that he did not have the equipment he needed to teach those courses so he made a list of needed materials for McGarigle. When McGarigle received the list, he was extremely angry.
*16 Although Carl Schweitzer, another employee, corroborated plaintiff's description of the metal shop and its lack of ventilation, McGarigle and one of his maintenance staff, Michael Chach, stated that there was ventilation in the metal shop.
In December 1985, the district industrial arts supervisor, Jerry Papariello, gave plaintiff a booklet entitled "New Jersey Industrial Arts Education Safety Guide" together with Title 6 of the 1977 New Jersey Administrative Code, "Vocational Education Safety Standards," the 1982 amendment to Tile 6, and the "National Standard School Shop Safety Inspection Check List." Papariello advised plaintiff that defendant was about to adopt these materials "as our official safety guide," and considered them authoritative. The Safety Guide referred to and reproduced N.J.A.C. 6:22-5.2,[1] dealing with mechanical ventilation requirements.
Plaintiff continued to talk to McGarigle about the needs of the shop but without success. In early January 1986, when Papariello asked plaintiff to fill out a state monitoring safety evaluation, he marked many items as unsatisfactory. Although both Papariello and McGarigle received copies, no action was taken. In January 1986, Dr. John Coogan, from the State Department of Education, inspected plaintiff's shop as part of the State monitoring team; plaintiff advised him of the problems but nothing was done.
Plaintiff was evaluated three times a year by either McGarigle or the vice principal, Ernie Farino. McGarigle stated in his March 1986 summary evaluation that they were "happy" and "impressed" by plaintiff's performance.
*17 In June 1986, plaintiff was required to submit the needs of his facility for the following year. Papariello was in charge of major capital expenditures, such as machinery, while McGarigle was in charge of smaller items. Plaintiff's list to McGarigle reiterated items in need of repair, including windows, lights, the sink and ventilation. McGarigle again said he would take care of it but never did. When plaintiff returned to school in September 1986, no repairs or improvements had been made in his shop.
Plaintiff's evaluations in the 1986 to 1987 school year were again excellent. In the spring of 1987, Papariello offered plaintiff a position at the high school auto shop; plaintiff was very interested but was concerned with the equipment, mess and safety problems. The next morning when Papariello pressed plaintiff for an answer, plaintiff explained that he wrote a letter to the Board asking that "certain things" be done and if the Board agreed to do them, he would accept the position. Papariello became very annoyed and upset. According to Papariello, however, plaintiff made unreasonable demands for the auto shop.
In June 1987, plaintiff submitted the same list of things that needed to be done in the shop over the summer. When plaintiff returned to Quibbletown in September 1987, nothing was changed in the shop. He again complained to McGarigle and Papariello and also to Burt Edelchick, the Superintendent of Schools.
At the beginning of the 1987-88 school year, plaintiff and Schweitzer wrote to Edelchick, requesting a meeting. Edelchick requested more information, which plaintiff and Schweitzer provided, expressing concerns about safety; they sent copies to McGarigle and Papariello. Three days later, McGarigle evaluated plaintiff and noted no strengths. Finally, Edelchick advised plaintiff that he had met with Papariello and McGarigle who had assured him that "most of the things were taken care of."
Meanwhile, in the fall of 1987, plaintiff began coughing, having difficulty breathing and getting headaches, nausea and redness in his eyes. Plaintiff was diagnosed as having a pulmonary condition. Later in December 1987, after a student was "overcome *18 with fumes" and became "nauseated, dizzy, [with] wobbly legs, [and] went down to his knees," plaintiff decided to shut down the machines that were emitting fumes.
In December 1987, Ernest Farino, the vice principal, evaluated plaintiff as competent in every area. Over Christmas vacation, plaintiff sent a letter to Edelchick expressing his frustration "with all the normal channels" and his concern about the safety of himself and his students and requested that "O[SH]A [Occupational Safety and Health Act] (sic) be called in immediately to do an air quality check." Plaintiff sent a copy to McGarigle and advised him that he would no longer use the plastic heating machines and glues "due to [the] improper facility at present." Three days later, McGarigle evaluated plaintiff and found him competent in every area, but without any strengths.
On January 15, 1988, plaintiff wrote to Dr. Virginia Brinson, the Middlesex County Superintendent of Schools, "telling her who I was and what my problems were and how much trouble I was having," and asking to "be advised in advance of the date of a visitation by Dr. Coogan."
Responding to a memo from McGarigle, plaintiff wrote to McGarigle that hazardous activities in the metal shop should cease, stressing the inadequate ventilation and the resulting safety and health concerns he had. Plaintiff said that he was waiting for the results of an air quality test regarding the safety of his shop. At the end of January 1988, when plaintiff had another dispute with Papariello about air quality, Papariello said "this is your tenure year and I'm going to tell you something, you'll never see it ... I'm done with you. You can forget about tenure."
Shortly thereafter, Guy Vander Vliet, the Assistant Superintendent, asked plaintiff: "what's the problem?" Vander Vliet ultimately said "I don't think there's any use talking any more. I'll be truthful with you, I think that maybe you should go your way and Piscataway will go the other way." The following morning, McGarigle called plaintiff into his office, was "extremely mad" and said, "I don't care what you do, you ain't coming back. There's no *19 tenure. You're not going to get it." Unable to contact Edelchick or Vander Vliet again, plaintiff called Gordon Moore, the Personnel Director, to ask for advice but this brought no satisfaction.
On February 22, 1988, plaintiff's doctor sent a letter to defendant explaining that "continued exposure to wood dust, smoke and fumes is detrimental and may result in an irreversible pulmonary disease." Plaintiff had "hyperactive airways disease and probable occupational asthma." Plaintiff intended to return to work immediately but on Edelchick's advice stayed home pending the air quality check. On March 2, 1988, after plaintiff had been out of work about a month, he wrote to Edelchick asking for a copy of the air quality report but received no response.
Plaintiff next heard from defendant on April 18, 1988, when he received a letter from McGarigle including his summary evaluation for the school year and explaining that he could not recommend rehiring or tenure because plaintiff was unable to perform his teaching duties. However, plaintiff asserted that he was always available to teach either without using the machines that emitted fumes or with adequate ventilation during use.
According to McGarigle, the only reason he did not recommend plaintiff for tenure was his unavailability to teach and the letter from plaintiff's doctor. McGarigle felt that he and plaintiff had a good, positive relationship during plaintiff's first two years. McGarigle denied ever mentioning tenure to plaintiff before March 1988 when he decided not to recommend plaintiff when he prepared plaintiff's annual summary evaluation. However, in his deposition, McGarigle had stated that he had another reason for not recommending him for rehiring: plaintiff complained that the shop was filthy when, according to McGarigle, he should have cleaned it up.
Plaintiff received a letter from the Board dated April 15, 1988, advising him that it had decided not to rehire him. Plaintiff appealed that decision to the Board but it rejected his appeal.
*20 Some time after plaintiff stopped teaching, an air quality test was done in the Quibbletown metal shop. However, no machines were running that day nor had been running for "a long time" before that day. According to Mark Goldberg, an industrial hygienist, an air quality test should be done "during the course of the usual activities." Goldberg also explained that a test done when the classroom is not in use is invalid. Finally, Goldberg opined that "a local exhaust ventilation system," which surrounds a machine with a hood that sucks up fumes, is essential for the injection molders and many other machines used in a metals course because these machines emit gases, fumes and dust, which, under OSHA and other professional standards, require ventilation for safety.
At the conclusion of all the evidence before a jury, the judge reserved decision on defendant's motion to dismiss the complaint. After a jury verdict in favor of plaintiff for compensatory damages of $60,000, the court granted the motion and dismissed the complaint.
On June 26, 1992, the judge entered a final judgment in favor of defendant dismissing the complaint, notwithstanding the verdict.[2] Plaintiff's motion for a new trial was denied. No order denying plaintiff's motion for a new trial is in the record nor has the judge ever stated any reasons for the denial.

I.
Plaintiff contends that the trial judge erred in determining that he failed to prove violations of CEPA. At the time when plaintiff was not rehired, N.J.S.A. 34:19-3[3] provided:

*21 An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;
....
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
With regard to subsection a., plaintiff argues that School Principal McGarigle and Superintendent Edelchick were both supervisors to whom he made a disclosure. He cited a specific regulation, N.J.A.C. 6:22-5.2, contained in the "New Jersey Industrial Arts Education Safety Guide," and contended that under subsection a. he need not "go beyond" a supervisor with his disclosure, but must go only "to a supervisor."
As to subsection c., plaintiff contends that he proved that: (1) he refused to participate in an activity, i.e., running machines that emitted noxious fumes; and, (2) he reasonably believed that this activity was in violation of a State regulation and incompatible with a clear mandate of public policy affecting the health and safety of public school children.
Regarding plaintiff's cause of action under N.J.S.A. 34:19-3a, the judge first determined that Principal McGarigle was not a supervisor under CEPA. "Supervisor" is defined in N.J.S.A. 34:19-2d (footnote added):
[A]ny individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which *22 the employee complains, or who has been designated by the employer on the notice required under section 7 of this act.[4]
The judge found that McGarigle was not a supervisor because he did not have the authority to take corrective action. Authority to take corrective action, however, is only one of three alternative factors listed in the definition. Therefore, McGarigle clearly was a "supervisor" under the Act because he directed and controlled plaintiff's work.
The legislative history supports this interpretation. Assembly Labor Committee Statement to S. No. 1105, dated May 22, 1986, states:
The committee also amended the definition of "supervisor" to include any individual with authority to take corrective action regarding the activity, practice, or policy about which the employee complains. Prior to this amendment, the bill's definition of "supervisor" included only individuals with "managerial authority."
A school principal obviously has authority to direct and control the work of a teacher. McGarigle had the ultimate control over which courses plaintiff taught. He also evaluated teachers and recommended them for rehiring.
In addition, McGarigle did have the authority to correct the lack of ventilation for the machines. All he had to do was approve plaintiff's suggestion that plaintiff teach drafting, which did not require the use of the machines. In finding that McGarigle did not have the authority to take corrective action because of his limited budget and inability to contract for outside services, the judge improperly decided a factual question adverse to plaintiff when the judge should have given plaintiff the benefit of all the favorable testimony. McGarigle testified that he was responsible for the safety of everyone in the building and that he had the authority to purchase equipment and materials "necessary to run the school." Thus, a jury could reasonably have found that ventilation equipment was necessary and within McGarigle's authority *23 to acquire. McGarigle was thus plaintiff's supervisor as defined in N.J.S.A. 34:19-2d.
The judge also erred in his determination that plaintiff was required to make his disclosure "to someone beyond ... a supervisor within the meaning of the statute." N.J.S.A. 34:19-3a prohibits retaliatory action against an employee for making a disclosure "to a supervisor or to a public body." Either a supervisor or a public body satisfies the statute. When plaintiff and Schweitzer wrote to Edelchick in October 1987, he set up and canceled meetings, and apparently attempted to get McGarigle to deal with the problems. This memo constitutes a disclosure to a "supervisor." A jury could also reasonably conclude that plaintiff knowingly reported the conditions in his shop to a "public body," namely, the Middlesex County Office of the State Department of Education, because he wrote to Dr. Brinson, the County Superintendent of Middlesex County schools.
The judge further denied plaintiff's claim under N.J.S.A. 34:19-3a (and apparently N.J.S.A. 34:19-3c(1)), because plaintiff failed to cite any specific law, rule or regulation that defendant had violated. The judge improperly rejected the "New Jersey Industrial Arts Education Safety Guide," as not adequately specific, finding that it did not "provide levels, nor did it provide an objective guide." This "Safety Guide" does set forth specific "levels," reproducing the provisions of the former N.J.A.C. 6:22-5.2a, regarding outdoor air supply and exhaust requirements.
Plaintiff need only have a reasonable, objective belief that there was a specific violation.[5] Here, plaintiff testified that *24 based upon his twenty years of experience in school shops, he "definitely believed" that the conditions in his shop were "below law standards" when he asked his superiors to contact OSHA. The jury could have found plaintiff's belief that a regulation was violated to be objectively reasonable based upon: (1) his descriptions of the lack of ventilation and the air quality in the shop; (2) Schweitzer's testimony that the ventilation was not working and there were constant, noxious fumes in the shop; (3) plaintiff's work-connected pulmonary problems; and, (4) the testimony of plaintiff's expert that the ventilation was inadequate and the air was unsafe.
Considering plaintiff's claim under N.J.S.A. 34:19-3c(3), the judge determined that plaintiff failed to establish a clear mandate of public policy, again rejecting the "Safety Guide" as "only a vague reference" which, like a company's rules and regulations, was "not conclusive." However, the "Safety Guide," reproducing the State regulation for shop ventilation requirements, was specific and binding and constituted a regulation promulgated pursuant to law under N.J.S.A. 34:19-3c(1).
Adequate ventilation in a school shop also constitutes a clear mandate of public policy concerning the public health, safety or welfare under N.J.S.A. 34:19-3c(3). What is more important to a school environment than safety and a healthy environment? In Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 446, 538 A.2d 1292 (App.Div. 1988), we determined that the retaliatory discharge of an employee for filing an OSHA complaint violated New Jersey public policy:
It is clear to us that there is a strong public policy in New Jersey favoring safety in the workplace. As Pierce [v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980)] directs, we have gleaned this policy from legislation, more particularly *25 N.J.S.A. 34:6A-3 [requiring employers to furnish a "reasonably safe and healthful" place of employment]....
[Id. at 445-46, 538 A.2d 1292 (citation omitted).]
The New Jersey Public Employees' Occupational Safety and Health Act, N.J.S.A. 34:6A-25 to -49, specifically includes any school district within its definition of "Employer." N.J.S.A. 34:6A-27(c). Employers are required to "[p]rovide each of his employees with employment and a place of employment which are free from recognized hazards which may cause serious injury or death to his employees." N.J.S.A. 34:6A-33(a). The Legislature specifically declared "that it is the policy of this State to ensure that all public employees be provided with safe and healthful work environments free from recognized hazards." N.J.S.A. 34:6A-26(a).
Plaintiff did nothing more than assert his and his students' rights to a safe school shop. Plaintiff reasonably believed that the utilization of machines under the inadequate conditions of the Quibbletown Middle School shop was illegal, in violation of the New Jersey regulation as set forth in the "Safety Guide," and in violation of the public policy concerning his and his students' health and safety.
Finally, defendant argues that it was justified in not rehiring plaintiff because he was unable to perform his teaching duties. The judge instructed the jury, however, that this was a legitimate reason for not reappointing plaintiff but that once defendant shows that it had "a good faith reason ... the burden then shifts back to the plaintiff to prove that that isn't true .... that that's just a pretext." The judge later clarified his charge, pointing out that plaintiff had the initial burden of proving a prima facie case of retaliation. The jury thus considered and rejected this defense.
The judge, therefore, erred in determining that plaintiff failed to prove violations of CEPA.

II.
Plaintiff contends that the judge also incorrectly determined that defendant was not vicariously liable for the improper actions *26 of its employees, Superintendent Edelchick and Principal McGarigle. Plaintiff argues that the actions of Edelchick and McGarigle were within the scope of their employment, even though they were improper and not specifically authorized.
The judge based his decision on the definition of "employer" in N.J.S.A. 34:19-2a which defines "employer" as an:
[I]ndividual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.
As "school district" is expressly included in that definition, the issue is whether defendant can be held responsible for the actions of its supervisory employees or agents. The definition expressly includes "any person or group of persons acting directly or indirectly on behalf of or in the interest of the employer with the employer's consent ..." The use of the word "consent" does not do any more than reflect recognition of normal principal and agent as well as respondeat superior principles. Therefore, the issue is whether the defendant, clearly an employer under the statute, is responsible for the actions of Edelchick and McGarigle. The parties agree that the normal rules of agency or respondeat superior apply, but disagree as to the application.
In Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 331-34, 173 A.2d 258 (1961), the Court held plaintiff, a Dari-Delite franchisor, liable for the actions of its agent, who improperly took a rebate or commission from suppliers of ice cream mix. The Court reasoned that:
since the principal placed the agent in the position where he had the power to perpetuate the wrong, the principal rather than the innocent third party should bear the loss.

[Id. at 338, 173 A.2d 258.]
The Restatement (Second) of Agency § 219(1) (1958), similarly provides that "[a] master is subject to liability for the torts of his *27 servants committed while acting in the scope of their employment." Section 228(1) provides:
Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master....
The Supreme Court of New Jersey has adopted this provision. See Printing Mart v. Sharp Electronics Corp., 116 N.J. 739, 770-71, 563 A.2d 31 (1989) (corporate defendants could be liable for employees' intentional interference with prospective contractual relations and defamation).
Even if the servant's conduct must at least be partially motivated by a purpose to serve the master, the actions of McGarigle and Edelchick, in recommending that plaintiff's contract not be renewed, were within the scope of their employment. Recommendations to renew or not to renew teachers' contracts were actions which the superintendent of schools and building principal were employed to perform.
The jury indicated that defendant should have known that its agents' recommendations were improper. It asked: "is it reasonable to assume they [defendant] are responsible for knowing a teacher's written challenge to his supervisor's recommendation?" and "Does the board secretary Vander Vliet have a responsibility to inform the board of his knowledge of disputed recommendations[?]" The judge declined to answer. Here, as in Ross, supra, the agents' improper actions were within the scope of their employment and the principal is liable for the agents' wrongdoing.
The judge's emphasis on defendant's status as a public employer was unwarranted. CEPA specifically includes public as well as private employers and in its terms makes no distinction between the two. The Tort Claims Act, N.J.S.A. 59:2-2a, provides: "A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." Thus, the Legislature *28 intended that the same rules of vicarious liability applicable to private principals also be applied to public entities.
In discrimination cases, employers have traditionally been held responsible for the improper actions of their supervisory employees. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 619, 626 A.2d 445 (1993) (citing Restatement (Second) of Agency, Sec. 219); see also Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652, cert. denied sub nom., University of Medicine & Dentistry v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).
Under the traditional respondeat superior theory, defendant is liable because the actions of Edelchick and McGarigle in recommending non-renewal of plaintiff's contract were within the scope of their authority. The judge erred in holding that defendant could not be vicariously liable for the actions of its supervisors, Edelchick and McGarigle.

III.
Plaintiff contends, in the alternative, that the judge erred in denying his motion for a new trial and failed to state any reasons for the denial. In support of his motion for a new trial, plaintiff submitted evidence that the Board did have actual knowledge of what had occurred. It is unnecessary for us to consider this issue since the judgment has been reversed for other reasons.

IV.
Plaintiff objects to the pretrial order that "the issue of punitive damages shall be severed for purposes of trial, to be determined by the court in a subsequent proceeding, without a jury, should plaintiff ... prevail on the issue of liability." Defendant counters that punitive damages are unavailable under the theory of respondeat superior and, further, because defendant is a public entity.
N.J.S.A. 34:19-5 provides that an aggrieved party may institute a civil action upon a violation of any of the provisions of CEPA. The statute continues:

*29 Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any legal or equitable relief provided by this act or any other statute. The court may also order:
....
f. Punitive damages....

[N.J.S.A. 34:19-5.]
The judge apparently believed that since the statute provides that the "court" may order punitive damages, he was justified in removing this issue from the jury. The judge also expressed concern about awarding punitive damages against a public entity.
This interpretation is inconsistent with the legislative intent under CEPA. Originally, CEPA did not make any provision for jury trials. Amending both CEPA and the LAD to provide for jury trials and add remedies available in common law tort actions, L. 1990, c. 12, was clearly a response to Shaner v. Horizon Bancorp., 116 N.J. 433, 457, 561 A.2d 1130 (1989). In Shaner, the Court held that "an action under the Law Against Discrimination does not entail the right to a trial by jury." Ibid. In taking this action, the Legislature clearly dictated that cases brought under these statutes should be treated in the same manner as common law tort actions, with plaintiffs being permitted a jury trial and the ability to recover the full range of legal damages. N.J.S.A. 34:19-5 specifically directs a jury "to try the validity of any claim under this act specified in the suit." Punitive damages are part of a claim under the act specified in this suit. Allowing plaintiff the remedies available in common law tort actions, the remedy of punitive damages herein should be decided by a jury, as it is in common law tort actions. There is no reason to remove this issue from the jury.
Defendant's claim that punitive damages are unavailable because it is a public entity appears to be raised for the first time on appeal. The trial judge thus did not consider or decide this issue. Punitive damages are available in accordance with the plain *30 meaning of the statute. N.J.S.A. 34:19-2a clearly includes public entities within the definition of "employer." N.J.S.A. 34:19-3 prohibits employers from taking retaliatory action. N.J.S.A. 34:19-5f specifies that punitive damages are available "[u]pon a violation of any of the provisions of this act." Because there is no exclusion of public employers from the provision for punitive damages, the Legislature obviously intended public employers, like other employers, to be subject to this relief.
Defendant cites City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-71, 101 S.Ct. 2748, 2759-62, 69 L.Ed.2d 616, 631-34 (1981), which sets forth some excellent reasons why punitive damages should not be awarded against a public entity in an action brought under the Civil Rights Act, 42 U.S.C.A. § 1983. The Legislature obviously considered these reasons when it enacted CEPA; yet, the Legislature made no exception for public entities regarding punitive damages relief.
Defendant also notes that the Tort Claims Act, N.J.S.A. 59:9-2c, provides that "[n]o punitive or exemplary damages shall be awarded against a public entity." If the Legislature had intended to exempt public entities from punitive damages under CEPA, however, it would have done so, as it did generally in the Tort Claims Act.[6] Defendant contends that this provision of the Tort Claims *31 Act applies to actions brought under CEPA, citing Fuchilla, supra, 109 N.J. 319, 537 A.2d 652. There, the Court held that the notice provisions of the Tort Claims Act did not apply to actions brought under the Law Against Discrimination. Id. at 337-38, 537 A.2d 652. Although limiting the holding to the notice provisions of the Tort Claims Act, the Court did note that the differences between the two statutes "suggests that the Legislature did not intend that the [Tort Claims] Act apply to discrimination claims under the Law [Against Discrimination]." Id. at 335, 537 A.2d 652.
Under CEPA, punitive damages are available, even against a public entity, and should be decided by a jury. A greater threshold than mere negligence should be applied to measure employer liability for punitive damages; they are to be awarded when the wrongdoer's conduct is especially egregious but "only in the event of actual participation by upper management or willful indifference." Lehmann, supra, 132 N.J. at 624-25, 626 A.2d 445.
On remand, we leave it to the court to determine what facts are necessary for the plaintiff to hold the defendant liable for punitive damages, following the standard for liability for punitive damages set forth in Lehmann. Id. at 624-25, 626 A.2d 445.

V.
Defendant objects to the admission into evidence of the parties' workers' compensation settlement. Plaintiff had made two different claim petitions, one for pulmonary and internal disability and the other for nasal and nervous system disability. In those proceedings, defendant admitted that plaintiff "suffered exposure which resulted in permanency of a pulmonary nature" and "was exposed to deleterious substances causing permanency of a nasal nature."
Prior to trial, the judge ruled that the stipulation would be admitted, rejecting defendant's argument that defendant's delegation *32 of authority to handle the claim barred its admissibility. The judge said that defendant "made such a representation in a court of competent jurisdiction and paid the claim in reliance upon such admission. They may not now repudiate such admission made by an authorized agent who acted within the scope of his authority."
Defendant contends that it is inadmissible under Evid.R. 52(1) (now, as amended, N.J.R.E. 408) which states:
Evidence that a person has, in compromise ... furnished ... money ... to another who has sustained ... loss or damage, is inadmissible to prove his liability for the loss or damage or any part of it.
However, the workers' compensation settlement was not offered to prove defendant's liability for plaintiff's workers' compensation claim. Rather, it was offered to prove that plaintiff had a reasonable belief that safety standards were violated because the violations had caused defendant to suffer pulmonary and nasal ailments as a result of his exposure to noxious fumes in his metal shop.
Evid.R. 53 (now, as amended, N.J.R.E. 408) provides:
Evidence that a person has in compromise accepted . .. a sum of money ... in satisfaction of a claim, is inadmissible to prove the invalidity of the claim or any part of it, but it is admissible to prove an accord and satisfaction or other material fact.
Since the settlement was offered to prove another material fact (that plaintiff reasonably believed that the air quality in his shop was deficient), it was admissible under this rule. See Wunschel v. City of Jersey City, 96 N.J. 651, 666, 477 A.2d 329 (1984).
Defendant could have denied liability in the workers' compensation proceeding, but elected not to do so by entering into a settlement in accordance with N.J.S.A. 34:15-20.
Defendant contends that the admission into evidence of the settlement was inflammatory and unduly prejudicial. Under Evid.R. 4 (now N.J.R.E. 403), the judge had the discretion to exclude it on these grounds, but declined to do so. It was properly admitted into evidence to prove a material fact, other *33 than defendant's workers' compensation liability, under Evid.R. 53.

VI.
Defendant contends that in the event of a retrial, only liability should be considered, and not the $60,000 award of damages, because this sum "approximated [plaintiff's] back pay claim and was well within the jury's reasonable discretion." Plaintiff counters that the $60,000 award was clearly inadequate in light of his past wage loss claim of $57,000, and it reflected the jury's confusion, as expressed in their questions to the judge, on the issue of liability.
Plaintiff failed to make a motion for an additur or a new trial on damages within ten days of the jury verdict as required by R. 4:49-1(b). The judge's oral opinion setting aside the verdict occurred on the eleventh day. On appeal, neither party has challenged the damage verdict per se. In fact, plaintiff did not make reference to this issue in any of his point headings in the table of contents of his brief, as required by R. 2:6-2(a)(1). There is no basis for a retrial of compensatory damages.
The trial court's judgment setting aside the verdict is reversed and the jury's verdict of $60,000 is reinstated. That part of the order dated December 13, 1991, which severed the issue of punitive damages for a separate determination in a subsequent proceeding without a jury if plaintiff prevailed on the issue of liability, is reversed and this matter is remanded to the trial court for a jury trial on the issue of punitive damages.
PETRELLA, P.J.A.D., concurring and dissenting.
I concur in all of the majority opinion except with respect to the punitive damages claim against the public entity. A public entity can only act through its agents, servants and employees, and when punitive damages are assessed against a public entity they are in effect being assessed against the taxpayers. See City of Newport *34 v. Fact Concerts, Inc., 453 U.S. 247, 266-271, 101 S.Ct. 2748, 2759-2762, 69 L.Ed.2d 616, 632-634 (1981).
It seems unlikely that the Legislature intended to authorize punitive damages claims under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, against public entities in the face of the Tort Claims Act, N.J.S.A. 59:9-2c, which states: "No punitive or exemplary damages shall be awarded against a public entity." No clear statement of intent to negate N.J.S.A. 59:9-2c appears in any of the legislative history of CEPA. It might well be in the Legislature's anxiousness to move forward it did not take into account all the ramifications of the language of the more recent statute. But implied repealers are disfavored.
Unless there was specific intent shown in the CEPA to negate the provisions of N.J.S.A. 59:9-2c, I would conclude that the majority's construction of CEPA disregards established principles of construction regarding implied repealers.[1]
The law imposes a strong presumption against implied repealers of statutes. See Brewer v. Porch, 53 N.J. 167, 173, 249 A.2d 388 (1969). See also State v. Des Marets, 92 N.J. 62, 93, 455 A.2d 1074 (1983) (Handler, J., dissent and concurrence). As Justice Handler noted in his dissenting opinion in Des Marets:
The judicially declared repeal of statutes should be undertaken only when it is abundantly clear that the Legislature itself intended to cancel one statute by enacting another. For that reason, courts properly insist that the legislative intent to repeal an earlier statute be manifest, State v. States, 44 N.J. 285, 291 [208 A.2d 633] (1965), and expressed clearly by the terms of the statute or indisputably reflected in its legislative history. See State v. Reed, 34 N.J. 554, 561 [170 A.2d 419] (1961). In order to repeal an earlier enactment by implication, a later statute must allow no other result and admit of no other reasonable interpretation. It *35 must clearly exclude any possibility for the coexistence of both pieces of legislation. See State v. States, 44 N.J. at 291 [208 A.2d 633].
Id. at 93, 455 A.2d 1074.
This is particularly true here in light of the very specific declarations in the Tort Claims Act. The Legislature declares in N.J.S.A. 59:1-2 that:
[I]t is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration.
Hence, since "implied repealers are generally disfavored and reluctantly invoked, e.g., Camden v. Byrne, 82 N.J. 133, 411 A.2d 462 (1980)"; Renz v. Penn Central Corp., 87 N.J. 437, 459, 435 A.2d 540 (1981), in my opinion it is likewise "unsound to impute to the ... Legislature an intent to repeal" (87 N.J. at 466, 435 A.2d 540) (Schreiber, J., concurring) the prohibition of punitive damages against a public entity as contained in the Tort Claims Act.
Here, it would appear that the provisions of the CEPA and the Tort Claims Act can fairly and reasonably be construed in a manner that gives effect to both statutes merely by restricting punitive damages claims to non-public entities.
There must be a clear intent to repeal inconsistent provisions. Jersey City v. Department of Civil Service, 7 N.J. 509, 522, 81 A.2d 777 (1951).
I would affirm the dismissal of the punitive damages claim as to the public entity.
NOTES
[1] N.J.A.C. 6:22-5.2 apparently has been superseded. "Vocational Education Safety & Health Standards" is now N.J.A.C. 6:53. N.J.A.C. 6:53-1.2(a) adopts N.J.A.C. 12:100, "Safety and Health Standards for Public Employees." N.J.A.C. 12:100-4.2(a) adopts 29 C.F.R. § 1910, "General Industry Standards," and N.J.A.C. 12:100-5.2(a) adopts 29 C.F.R. § 1926, "Construction Industry Standards."

We refer to the former N.J.A.C. 6:22-5.2, presumably in effect in 1985 and throughout plaintiff's employment in Piscataway.
[2] An order was also entered May 29, 1992 entering final judgment in favor of defendant dismissing the complaint but not including the "notwithstanding the verdict" language.
[3] The statute was amended effective December 29, 1989, in matters unrelated to this case. L. 1989, c. 220, § 1.
[4] N.J.S.A. 34:19-7 requires employers to post notices of employees' "protections and obligations under this act," which must name persons designated to receive written notifications.
[5] We do not decide the question of whether there does not have to be an actual violation, as suggested by amicus' brief, so long as plaintiff has a reasonable belief that there is a violation. The 1972 Amendments to Title VII of the Civil Rights Act of 1964 enacted an anti-reprisal section which prohibits adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter..." § 704(a), 42 U.S.C. § 2000e-3(a). The words "reasonable belief" do not appear anywhere in statutory language. Nevertheless, according to the amicus, nine out of ten Circuit Courts of Appeal which have been called upon to engraft a "reasonable belief" test by implication have done so to protect an employee who only has a reasonable belief that an employment practice was unlawful.
[6] This is the same statutory construction reached by the Supreme Court of Iowa in Young v. DesMoines, 262 N.W.2d 612 (1978), 1 A.L.R.4th 431, where Iowa's Tort Claims Act specifically precluded punitive damages. It should be noted that this decision was superseded by statute expressly excluding local governmental liability for punitive damages as indicated in Vinson v. Linn-Mar Community School Dist. (Iowa) 360 N.W.2d 108. The Court construed a comprehensive state tort claims act that represented a thorough treatment of governmental liability for torts and omitted any prohibition against punitive damage awards within the framework of the recovery permitted by statute. The court found that the statute did not suggest a legislative intent to prohibit the assessment of punitive damages against governmental subdivisions, particularly where the corresponding state tort claims act specifically precluded punitive damage awards against the state and its provisions where not reflected in the governmental subdivision tort claims act. 57 Am.Jur.2d Municipal, Etc., Tort Liability, § 695, p. 638, n. 84.
[1] Although I could also view the majority's interpretation of the statute as a reasonable construction of the statute, it is still questionable whether the implied overruling of the Tort Claims Act, limited to CEPA causes of action, was intended. The majority's position would leave it to the Legislature to correct any error in its enactment.