735 A.2d 548

JOSEPH CAVUOTI AND LINDA L. CAVUOTI, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. NEW JERSEY TRANSIT CORPORATION, DEBORAH FINN, AND R.J. SMITH, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS, AND ED MCGITTIGAN, JOHN DOE AND RICHARD DOE (FICTITIOUS NAMES OF PERSONS WHOSE IDENTITIES ARE PRESENTLY UNKNOWN), DEFENDANTS.

Argued March 15, 1999—Decided August 10, 1999.

112

*Anthony M. Mahoney* argued the cause for appellants and cross-respondents(*Mahoney & Mahoney,* attorneys; *Mr. Mahoney, Dennis M. Mahoney* and *Teresa A. Kazista,* on the briefs).

Robert A. Shire, Deputy Attorney General, argued the cause for respondents and cross-appellants (Peter Verniero, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, and Jeffrey C. Burstein, Deputy Attorney General, of counsel).

PER CURIAM.

■ The central issue in this employment discrimination case concerns when victims of workplace discrimination may recover punitive damages. Our decision in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993), "established two distinct conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under the [the New Jersey Law Against Discrimination]." Rendine v. Pantzer, 141 N.J. 292, 313, 661 A.2d 1202 (1995). Those two requirements are (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.'" Id. at 314, 661 A.2d 1202.

■ In this case the jury awarded substantial punitive damages to the prevailing party. The pivotal issue is whether the instruction to the jury insured that the Lehmann prerequisites for punitive damages were met. Without objection, the trial court submitted the case to the jury without a specific instruction that jurors were required to find that there had been actual participation in, or willful indifference to, the wrongful conduct on the part of upper management. Because the issue arises as plain error under Rule 2:10–2, the question is whether the omission of the Lehmann upper-management charge was clearly capable of producing an unjust result. We find that because the offending employees were not so clearly members of upper management, the error was capable of producing an unjust result.

■ Another issue presented is whether a public entity may be liable for punitive damages under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5–1 to –49. We answer that question concerning recovery of punitive damages against a public

entity in the affirmative on the basis of the reasoning of the three-member affirmance in *Abbamont v. Piscataway Township Board of Education*, 138 *N.J.* 405, 650 *A.2d* 958 (1994), *appeal after remand*, 314 *N.J.Super.* 293, 714 *A.2d* 958 (App.Div.1998). We will only briefly discuss other issues raised in this case.

I

At the time plaintiff Joseph Cavuoti filed his complaint, he was fifty-one years old and had worked for New Jersey Transit Corporation (NJT) for approximately eight years. During that time he had received several promotions. Plaintiff contends that he was the victim of age discrimination in his applications for five different promotions between 1989 and 1993. The first three positions for which he applied were awarded to younger candidates. Plaintiff claims that the men chosen for the positions were not as qualified as he when comparing their training, mechanical experience, and management skills.

In late 1993, plaintiff filed a grievance with NJT's Equal Opportunity/Affirmative Action Office (EOAA) alleging that he had been denied the promotions due to his age. In addition, plaintiff filed a complaint in January 1994, with the federal Employment Equal Opportunity Commission (EEOC).

On March 10, 1994, plaintiff's superintendent Deborah Finn called him into her office for a meeting. Finn told Cavuoti that employees are not to file with the NJT EOAA alleging discrimination, and that those employees who do so will face problems. Additionally, Finn told Cavuoti that he had to obtain her approval before calling or writing to the EOAA again.

In mid-March 1994, plaintiff contacted Robert Smith, General Superintendent of the Newark Division, Finn's immediate supervisor, concerning his problems with Finn. Consequently, Smith held a meeting with plaintiff and Finn requesting that the two resolve their differences. For the next six to eight months plaintiff regularly complained to Smith about Finn's alleged

harassment. In late 1994, the EEOC determined that there was insufficient evidence to support plaintiff's claim.

Finn gave plaintiff an unfavorable annual review for the 1995–96 year, just as she had for the 1994–95 year. In her review, Finn alleged that plaintiff either performed unsatisfactorily or needed improvement in several key areas. Plaintiff was terminated on August 6, 1996, by Finn, Smith, and Joseph Allen, NJT's Director of Human Resources. Plaintiff's notice of termination indicated that he had failed to supervise employees, had demonstrated poor judgment, and did not follow management's direction despite continuing advice and counseling.

Cavuoti filed a complaint in the Law Division alleging that the NJT had passed him over for promotions in favor of younger employees, in violation of the LAD. He later amended his complaint to assert a retaliatory discharge claim because his supervisors Deborah Finn and Robert Smith had objected to his assertion of such rights. The jury returned a verdict in favor of plaintiff, finding age discrimination in connection with two of the promotional positions to which plaintiff had applied. The jury also found that plaintiff was discharged from his management position of general foreman in retaliation for his age discrimination claim. On these claims the jury awarded plaintiff a total of $222,323 in compensatory damages ($177,323 in lost wages and $45,000 for emotional distress). The jury also awarded $1 million in punitive damages.

In an unpublished opinion, the Appellate Division remanded the punitive damages award for a new trial, but affirmed the jury verdict in all other respects. It found that the trial court had not instructed the jury that punitive damages can only be imposed based on a finding of actual participation or willful indifference by upper management. The panel found that a jury charge on this issue must make it "absolutely clear" that punitive damages cannot be imposed on an employer unless "upper management" had actually participated in or shown willful indifference to the discriminatory conduct. The panel concluded that if the jury

charge fails to make this point, as it did here, the charge is "legally incorrect and has a clear capacity of producing an unjust result." We granted both parties' petitions for certification. 156 *N.J.* 410, 411, 719 *A.*2d 642 (1998).

## II

### What is the Basis for an Award of Punitive Damages Under the LAD?

#### A.

The LAD provides that for any complaint filed under this act, "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs." *N.J.S.A.* 10:5–13. That provision amended the LAD in response to our holding in *Shaner v. Horizon Bancorp,* 116 *N.J.* 433, 561 *A.*2d 1130 (1989), in which the Court had reasoned that the LAD's provision for judicial enforcement was limited to relief akin to an administrative remedy. In the finding and declaration provision of the LAD, the Legislature catalogued the various harms suffered by victims of discrimination. *See N.J.S.A.* 10:5–3. The Legislature found that "[s]uch harms have, under the common law, given rise to legal remedies, including compensatory and *punitive damages.* The Legislature intends that such damages be available to all persons protected by this act. . . ." *Ibid.* (emphasis added). The Legislature indicated that the LAD "shall be liberally construed in combination with other protections available under the laws of this State[,]" consistent with the Legislature's "opposition to such practices of discrimination." *Ibid.*

The seminal New Jersey case discussing the assessment of damages against LAD violators is *Lehmann, supra,* 132 *N.J.* 587, 626 *A.*2d 445. In *Lehmann,* the Court held that an

employer is strictly liable for equitable relief to remediate any discriminatory hostile environment found in the workplace. 132 *N.J.* at 616–17, 626 *A.*2d 445. However a claim for compensatory damages is governed by "agency principles." *Id.* at 619, 626 *A.*2d 445. Under these principles, "an employer whose supervisory employee is acting within the scope of his or her employment [is] liable for the

supervisor's conduct in creating a hostile work environment," *ibid.*, and "even in the more common situation in which the supervisor is acting outside the scope of his or her employment, the employer will be liable in most cases for the supervisor's behavior under the exceptions set forth in § 219(2) [of the *Restatement (Second) of Agency* ]." *Id.* at 619–20, 626 *A.*2d 445. An employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor "to control the day-to-day working environment" facilitates the harassing conduct. *Id.* at 620, 626 *A.*2d 445.

[*Heitzman v. Monmouth County,* 321 *N.J.Super.* 133, 144–45, 728 *A.*2d 297 (App.Div.1999) (footnotes and additional citation omitted).]

However, the Court in *Lehmann* held that an "employer should be liable for punitive damages [under the LAD] only in the event of *actual participation by upper management or willful indifference.*" 132 *N.J.* at 625, 626 *A.*2d 445 (emphasis added). *Lehmann* was the first New Jersey case to impose the requirement that in order for an employer to be held liable for punitive damages under the LAD, there must be some involvement by a member of the employer's upper management.[1]

■ *Lehmann* did not set forth a precise definition or criteria by which to measure whether an offender is a member of upper management for the purposes of assessing punitive damages

---

1 The Supreme Court of the United States has held [since our *Lehmann* decision] that an employer's vicarious liability under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.* § 2000e to e17, for a discriminatory hostile work environment created by a supervisor is also governed by the principles set forth in [the *Restatement (Second) of Agency,*] § 219(2). *Burlington Indus., Inc. v. Ellerth,* 524 *U.S.* 742, ——, 118 *S.Ct.* 2257, 2267–68, 141 *L.Ed.*2d 633, 650–52 (1998); *Faragher v. City of Boca Raton,* 524 *U.S.* 775, ——, 118 *S.Ct.* 2275, 2290–91, 141 *L.Ed.*2d 662, 685–86 (1998). Applying those principles, the Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth, supra,* 524 *U.S.* at ——, 118 *S.Ct.* at 2270, 141 *L.Ed.*2d at 655; *Faragher, supra,* 524 *U.S.* at ——, 118 *S.Ct.* at 2292, 141 *L.Ed.*2d at 689. However, an employee may defeat such a claim by showing "'(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth, supra,* 524 *U.S.* at ——, 118 *S.Ct.* at 2270, 141 *L.Ed.*2d at 655; *Faragher, supra,* 524 *U.S.* at ——, 118 *S.Ct.* at 2293, 141 *L.Ed.*2d at 689.

[*Heitzman, supra,* 321 *N.J.Super.* at 145 n. 3, 728 *A.*2d 297.]

against the defendant employer. *Lehmann* held, however, that "[c]oncerning punitive damages, ... a greater threshold than mere negligence should be applied to measure employer liability." 132 *N.J.* at 624, 626 *A.*2d 445. "Punitive damages are to be awarded 'when the wrongdoer's conduct is especially egregious.'" *Id.* at 624–25, 626 *A.*2d 445 (quoting *Leimgruber v. Claridge Assocs.*, 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977)).

More recently, in *Taylor v. Metzger*, the Court noted that "[a] supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace." 152 *N.J.* 490, 503, 706 *A.*2d 685 (1998) (quoting *Lehmann, supra*, 132 *N.J.* at 622–23, 626 *A.*2d 445). Because the plaintiff's supervisor was the perpetrator of the racial harassment of the plaintiff, "plaintiff could not seek the redress that would otherwise be available to a victim of invidious workplace harassment, namely, resort to her own supervisor." *Id.* at 505, 706 *A.*2d 685. These statements in *Taylor* suggest that because the harasser was plaintiff's supervisor, his discriminatory treatment of her "increased [the] severity" of the conduct. *Id.* at 504, 706 *A.*2d 685.

### B.

In *Kolstad v. American Dental Association,* —— *U.S.* ——, 119 *S.Ct.* 2118, —— *L.Ed.*2d —— (1999), the Supreme Court recently held that victims of workplace discrimination may recover punitive damages under Title VII of the Civil Rights Act, 42 *U.S.C.A.* § 1981(a)(b)(1), without showing that the employer's conduct was "egregious." However, by a separate 5–4 vote, the Court held that an employer will not be vicariously liable for a manager's discriminatory employment decisions when those decisions are contrary to the employer's good faith efforts to comply with Title VII.

That decision is based on the express terms of 42 *U.S.C.A.* § 1981(a)(b)(1), which allows an award of punitive damages in a case of "reckless indifference" to human rights. Prior to 1991,

victims of job bias could seek relief only in the form of reinstatement. In 1991, Congress amended Title VII to provide compensation to the victims of employment discrimination for their pain, suffering, and lost future wages. It also allowed a jury to award up to $300,000 in punitive damages if the employer acted with "malice" or "reckless indifference" to the federally protected rights. Congress clearly intended that the standard apply to employers that engage in unlawful practices with callous indifference to the rights of workers.

Justice O'Connor's opinion for the Court is distinguished for its thoughtful discussion of the tensions between common-law principles of vicarious liability for punitive damages based on the unlawful conduct of employees acting with the scope of their employment, and the underlying policies of anti-discrimination programs. To repeat her analysis:

> Although jurisdictions disagree over whether and how to limit vicarious liability for punitive damages, *see, e.g.,* 2 J. Ghiardi & J. Kircher, *Punitive Damages: Law and Practice* § 24.01 (1998) (discussing disagreement); 22 *Am.Jur.*2d, Damages § 788 (1988) (same), our interpretation of Title VII is informed by "the general common law of agency, rather than ... the law of any particular State." ... The Restatement of Agency places strict limits on the extent to which an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages:
>
> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
>
> "(a) the principal authorized the doing and the manner of the act, or
>
> "(b) the agent was unfit and the principal was reckless in employing him, or
>
> "(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> "(d) the principal or a managerial agent of the principal ratified or approved the act." *Restatement (Second) of Agency,* supra, § 217 C. *See also Restatement (Second) of Torts* § 909 (same).
>
> [*Kolstad, supra,* 119 S.Ct. at 2129.]

Because the *Restatement (Second) of Torts,* § 909 at 468, comment b, states that it is "improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously[,]" Justice O'Connor reasoned that to punish employers seeking (even if not successfully) to deter discrimination, conflicts with Title VII's purposes, especially con-

sidering that the statute's primary goal is to prevent injury, not only to provide relief, if and when an injury has occurred. *Kolstad, supra,* 119 S.Ct. at 2129.

Because the application of agency principles of vicarious liability results in "perverse incentives" in this context, Justice O'Connor found it necessary to alter these "scope of employment" principles to ensure that Title VII's objectives are not undermined. Thus, the Court concluded that in Title VII discrimination cases, punitive damages should not be imposed on employers for the conduct of their employees under the theory of vicarious liability if the employer has made a good-faith effort to comply with Title VII. *Ibid.*

Although the vocabulary of our *Lehmann* standard is different from the *Kolstad* standard derived from Title VII, the concepts are somewhat similar.[2] Like the United States Supreme Court, we have recognized that the imposition of vicarious liability for punitive damages on employers based on the misconduct of employees requires a distinct method of analysis. And like the

---

[2] We have not yet had occasion to consider the effect of *N.J.S.A.* 2A:15–5.12 of the Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.17, on our requirement that the offending conduct be "especially egregious." That provision of the 1995 Act requires as a predicate for an award of punitive damages that the defendant acted with "actual malice" or "a wanton and wilful disregard of persons who might be harmed...." *N.J.S.A.* 2A:15–5.12.

Our cases have attempted to describe [,in similar terms,] conduct that is sufficiently egregious to warrant a punitive-damage award. In *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 477 *A.2d* 1224 (1984), we observed: "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil minded act' or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act...." *Id.* at 49–50, 477 *A.2d* 1224 (citations omitted). Similarly we noted in *Berg v. Reaction Motors Division,* 37 *N.J.* 396, 414, 181 *A.2d* 487 (1962): "Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences."

[*Rendine, supra,* 141 *N.J.* at 314, 661 *A.2d* 1202.]

Supreme Court we have afforded a form of a safe haven for employers who promulgate and support an active, anti-harassment policy.

As we explained in *Payton v. New Jersey Turnpike Authority*:

Of particular importance in *Lehmann*, we noted that an employer's liability for its own negligence in failing to take effective remedial measures was a form of direct liability in addition to vicarious liability. *Id.* at 623, 626 *A.2d* at 445. We stated that

[w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.... "Effective" remedial measures are those reasonably calculated to end the harassment. The reasonableness of the employer's remedy will depend on its ability to stop harassment by the people who engaged in harassment. [*Ibid.* (quotations and citations omitted).]

Thus, we determined that an employer that failed to take *effective* remedial measures against a harassing employee, was in essence, liable for his own conduct.

While the effectiveness of an employer's remedial steps relates to an employee's claim of liability, it is also relevant to an employer's affirmative defense that its actions absolve it from all liability. *See infra* at 540–41, 691 *A.2d* at 328–29. Thus, the efficacy an employer's remedial program is highly relevant to both the employee's claim against the employer and the employer's defense to liability.

[148 *N.J.* 524, 536–37, 691 *A.2d* 321 (1997).]

A company that develops policies reflecting a lack of tolerance for harassment will have less concern about hostile work environment or punitive damages claims if its good-faith attempts include periodic publication to workers of the employer's anti-harassment policy; an effective and practical grievance process; and training sessions for workers, supervisors, and managers about how to recognize and eradicate unlawful harassment.

## III

### What Criteria Determine Whether an Offender Is a Member of Upper Management Under *Lehmann*?

As noted, our case law defines what constitutes "especially egregious conduct" warranting the imposition of punitive damages. Our case law does not as clearly define the standards by which to

determine whether a wrongdoer is a member of the defendant employer's upper management.

## A.

At the margins, defining "upper management" is easy. A chief executive officer, chief operating officer, or a member of the board of directors satisfies the definition. At the other extreme, an assembly line worker or clerk with no supervisory responsibilities does not. Our task is to provide guidance for identifying "upper management" between those extremes. The task is fact-sensitive. *See* Marley S. Weiss, *The Supreme Court 1997–1998 Labor and Employment Law Term (Part I): The Sexual Harassment Decisions,* 14 *Lab. Law.* 261, 293–94 & n. 192 (1998) (citing cases demonstrating that it is unclear how far down the corporate ladder liability should extend).

The question of how "upper management" should be defined implicates several public policy concerns. As the Court in *Lehmann* noted, "the issue of the scope of an employer's liability for ... punitive damages [is] a question of public policy." *Lehmann, supra,* 132 *N.J.* at 625, 626 *A.*2d 445. In considering these different public policy concerns, the Court noted that "the crucial issue [is] which position provides the most effective intervention and prevention of employment discrimination." *Ibid.*

The following public policy considerations will help to define "upper management": (1) the purposes of the LAD; (2) the purposes of punitive damages; and (3) the demands of justice for a broadly-based definition that will be applicable to different employment structures.

## B.

### 1. *Upper Management Is Not Uppermost Management*

In *Gares v. Willingboro Township,* 90 *F.*3d 720 (1996), the Third Circuit decided whether, under New Jersey law, a Captain of the Services Division who sexually harassed a female police officer

could qualify as a member of upper management for the purpose of assessing punitive damages under the LAD. As a supervisor, Captain "Owens set the atmosphere and controlled the day-to-day operations of that office. Because of his high rank and pervasive influence over the employees he supervised, the jury was entitled to find that Captain Owens was an upper management official...." *Id.* at 733. The court reasoned that "the Township's 'upper management' cannot be limited to only the uppermost official, but must also include at least the next tier of officials, which includes the Chief of Police." *Ibid.* (citing *Abbamont, supra,* 138 *N.J.* at 429, 650 *A.*2d 958) (referring to "managerial or supervisory government officials"). (Owens had become Chief of Police before the suit was commenced. The court found, as well, that the prior Chief of Police also callously had disregarded Gares's complaints and "refused to permit Gares to report his conduct to the [then-] Chief of Police.") *Ibid.*

▮▮▮ Generally, our public agencies have viewed managerial executives as occupying more than the uppermost tiers of management. Thus, in contexts such as labor relations, we have described as managerial executives those who have "significant power, discretion and influence within their own departments," capable of furthering the mission of the organization and of selecting courses of action from available alternatives. *New Jersey Tpke. Auth. v. American Federation of State, County and Mun'l Employees, Council 73,* 150 *N.J.* 331, 356, 696 *A.*2d 585 (1997). "Whether or not an employee possesses this level of authority may generally be determined by focusing on the interplay of three factors: (1) the relative position of that employee in his employer's hierarchy; (2) his function and responsibilities; and (3) the extent of discretion he exercises." *Ibid.*

### 2. Labels or Titles Are Not Particularly Helpful

A mere title of "manager" or "supervisor" does not by itself suffice to impute that employee's knowledge or actions to the employer. *Ulrich v. K-Mart Corp.,* 858 *F.Supp.* 1087, 1093 (D.Kan.1994)(holding employer not liable for allegedly harassing activities of an employee who had title of "loss control manager" but lacked

authority to hire, fire, discipline, control employees' wages, or control employees' schedules); *Hunter v. Countryside Assoc. for the Handicapped, Inc.,* 723 *F.Supp.* 1277, 1278 (N.D.Ill.1989) (holding that alleged harasser, whose title was "client supervisor," did not have the kind of supervisory powers necessary to impute his conduct to the employer: alleged harasser lacked authority to hire, promote, fire or discipline).

In a narrow set of circumstances, courts will also attribute a non-manager's knowledge to an employer. For example, the clock starts running on employer liability when notice is given to certain employees, who may or may not have any management-level authority but who have responsibility for relaying sexual harassment complaints pursuant to an express policy promulgated by the employer. *Campbell v. Board of Regents of the State of Kansas,* 770 *F.Supp.* 1479, 1487–88 (D.Kan.1991). Similarly, employer liability also kicks in when an employee complains of co-worker harassment to a non-management employee who has general responsibility for passing employment-related complaints up the corporate hierarchy.

[*Lamb v. Household Credit Servs.,* 956 *F.Supp.* 1511, 1516 (N.D.Cal.1997).]

### 3. Functional Assignments of an Employee Serve Better to Define Tiers of Management

 For example, functional assignments are immediately relevant in determining who is a supervisor for purposes of vicarious liability for compensatory damages. As explained by the Fourth Circuit,

the Court in *Faragher [v. City of Boca Raton,* 524 *U.S.* 775, 118 *S.Ct.* 2275, 141 *L.Ed.*2d 662 (1998) ] noted that "when a fellow-employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor 'whose power to supervise—[which may be to hire and fire], and to set work schedules and pay rates—does not disappear when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion.'" *Id.* 118 *S.Ct.* at 2291 (quoting [Susan] Estrich, *Sex at Work,* 43 *Stan. L.Rev.* 813, 854 (1991)). Which is to suggest that where the level of authority had by a harasser over a victim—hence her special vulnerability to his harassment—is ambiguous, the tip-off may well be in her response to it. Does she feel free to "walk away and tell the offender where to go," or does she suffer the insufferable longer than she otherwise might?

[*Mikels v. City of Durham,* 183 F.3d 323, 333 (1999).]

*See also Grozdanich v. Leisure Hills Health Center, Inc.,* 25 *F.Supp.*2d 953 (D.Minn.1998), *recons. denied,* 48 *F.Supp.*2d 885 (D.Minn.1999) (citing *Canutillo Ind. Sch. Dist. v. Leija,* 101 *F.*3d 393, 401–02 (5th Cir.1996)) (the agent " 'need not have ultimate authority to hire or fire to qualify as an employer, as long as he or

she has significant input into such personnel decisions.' "), *cert. denied*, 520 *U.S.* 1265, 117 *S.Ct.* 2434, 138 *L.Ed.*2d 195 (1997) (quoting *Paroline v. Unisys Corp.*, 879 *F.*2d 100, 104 (4th Cir. 1989), *modified*, 900 *F.*2d 27 (4th Cir.1990)); *Savino v. C.P. Hall Co.*, 988 *F.Supp.* 1171, 1185 (N.D.Ill.1997) (manager who had authority to recommend only termination could be supervisor under Title VII because apparent authority existed); *Saville v. Houston County Healthcare Auth.*, 852 *F.Supp.* 1512, 1527 (M.D.Ala.1994) ("A supervisor need not be 'high in the business structure' or have 'the authority to hire, fire, or promote' to be considered an agent" under Title VII)(quoting *Sims v. Montgomery County Comm'n*, 766 *F.Supp.* 1052, 1069 (M.D.Ala.1990)).

### C.

The difficult task is to draw the line between a "supervisor" or perhaps even a "manager" and "upper management." Prior to the Supreme Court's decisions in *Faragher* and *Ellerth*, corporate employers were protected from liability unless the employer itself was aware of or created a discriminatory, hostile work environment. Based on the level of the knowledgeable employee in the corporate hierarchy, courts developed various tests to determine whether the employer knew or had reason to know. *See Reynolds v. CSX Transport, Inc.*, 115 *F.*3d 860–66 (11th Cir.1997) (stating that plaintiff must show that she complained to someone in higher management), *cert. granted, judgment vacated by* —— U.S. ——, 118 *S.Ct.* 2364, 141 *L.Ed.*2d 732 (1998); *Van Zant v. KLM Royal Dutch Airlines*, 80 *F.*3d 708, 715 (2d Cir.1996) (stating that notice must be to "someone at a sufficiently high level in the [company] hierarchy"); *Nichols v. Frank*, 42 *F.*3d 503, 508 (9th Cir.1994) (stating proper test is whether "management-level employees knew or should have known"); *Andrews v. City of Philadelphia*, 895 *F.*2d 1469, 1486 (3rd Cir.1990) (declaring plaintiff must prove that "management level employees had actual or constructive knowledge" about harassment). (The cases before us are "tangible action" cases, not "hostile environment" cases.)

Just where that level ended gave rise to further analysis. Under one formulation, a "corporate employer may be held liable for exemplary damages if its employee who committed the wrongful act or authorized or ratified it was so high in authority as to be fairly considered executive in character." *Winkler v. Hartford Accident and Indem. Co.*, 66 *N.J.Super.* 22, 168 *A.*2d 418 (App. Div.), *certif. denied,* 34 *N.J.* 581, 170 *A.*2d 544 (1961). As expressed by other courts, the test is whether the employee has the "authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. School Dist.*, 524 *U.S.* 274, 118 *S.Ct.* 1989, 1993, 141 *L.Ed.*2d 277 (1998); whether the discriminating employee is " 'high up the corporate hierarchy.' " *Dudley v. Wal-Mart Stores, Inc.*, 166 *F.*3d 1317, 1323 (11th Cir.1999) (quoting *Splunge v. Shoney's, Inc.*, 97 *F.*3d 488, 491 (11th Cir.1996)); whether the employee has a "degree of discretion . . . in making decisions that will ultimately determine corporate policy." *Mitchell v. Keith,* 752 *F.*2d 385, 390 (9th Cir.), *cert. denied,* 472 *U.S.* 1028, 105 *S.Ct.* 3502, 87 *L.Ed.*2d 633 (1985) (citations omitted); or "whether the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage." *Doralee Estates, Inc. v. Cities Service Oil Co.*, 569 *F.*2d 716, 722 (2d Cir.1977) (citations omitted). Those definitions and that in *Gares, supra,* have a common premise—that the culpable employees have sufficient authority so that the imputation of damages against the employer is fair and reasonable.[3]

---

[3] As explained by Justice O'Connor, it is difficult to define "managerial capacity," especially because each inquiry must be fact-sensitive.

> In making this determination, the court should review the type of authority that the employer has given to the employee, [and] the amount of discretion that the employee has in what is done and how it is accomplished. . . . Suffice it to say here that the examples provided in the *Restatement of Torts* suggest that an employee must be "important," but perhaps need not be the employer's "top management, officers, or directors," to be acting "in a managerial capacity." . . . .

Seeking to avoid the metaphysical distinctions necessary to decide at what management level notice to employees constitutes notice to the corporation, Chief Judge Posner of the Seventh Circuit has suggested: "What is possible to identify is who has the authority to terminate the harassment of which plaintiff is complaining and did the plaintiff complain to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Young v. Bayer Corp.*, 123 *F.*3d at 672, 675 (1997). Judge Posner suggested a functional test instead of a hierarchial test. The test is expressed in homely but understandable terms easily adaptable to varying organizations. Judge Posner adopted the standard suggested by the Second Circuit in *Torres v. Pisano*, 116 *F.*3d 625 (2d Cir.), *cert. denied,* —— U.S. ——, 118 *S.Ct.* 563, 139 *L.Ed.*2d 404 (1997). In order for knowledge to be imputed to an employer, knowledge of the discriminatory conduct

> must either (1) come to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have, or (c) is reasonably charged by law with having, a duty to pass on the information to someone within the company who has the power to do something about it; or (2) come to the attention of such a someone.

> [*Young, supra*, 123 *F.*3d at 674.]

The *Bayer* language is a bit stilted, but the concepts are reasonably straightforward and can be adapted to our purposes. Using the concepts, upper management can be defined in a way that will apply to large, national corporations in the same manner that it applies to small, local employers. For example, a definition of upper management should apply with equal force to one such as Wal–Mart (if discrimination occurs in an individual Wal–Mart store), as it would to a local, family-owned market. If a Wal–Mart store manager were not considered "upper management" for LAD purposes, that classification could produce skewed results because the Wal–Mart store manager has many of the same responsibilities as the local market owner. If a Wal–Mart store manager

---

[*Kolstad,* —— U.S. ——, at ——, 119 *S.Ct.* at 2118, 2128, —— *L.Ed.*2d ——, at —— (internal citations and quotations omitted).]

were not considered "upper management," many large, national corporate employers could escape punitive damages liability simply because of size and corporate structure. We thus disagree with the Eleventh Circuit's holding in *Dudley, supra,* 166 *F.*3d at 1323, that punitive damages were not recoverable when a store's co-manager and assistant manager discriminated against two employees on the account of their race. That case is of doubtful precedential value after *Kolstad.* We prefer the formulation of a Washington state court which has defined "manager" thus:

> A "manager" is one who has the authority to hire employees, terminate employees, discipline employees, promote employees or otherwise exercise independent judgment and discretion over a certain area of the business, including the authority to take adequate steps to deal effectively with the actions or conduct which allegedly created the hostile work environment: An employer's use of the label "manager" or "management" may, but need not be, considered by you, along with all other evidence pertaining to the question of whether any particular person had the authority to deal effectively with the actions or conduct which allegedly created the hostile work environment.
>
> [*Parker–Jones v. Eagle Hardware & Garden, Inc.,* 1999 WL 169994, at *3 (Wash.App. Div. 1 Mar. 29, 1999) (unpublished).]

To aid the litigants and the trial court on remand, we offer the following suggestions on the definition of "upper management." A court should instruct the jury that the purpose of the definition of "upper management" is to "provid[e] employers with the incentive not only to provide voluntary compliance programs but also to insist on the effective enforcement of their programs...." *Lehmann, supra,* 132 *N.J.* at 626, 626 *A.*2d 445. In order to justify the imposition of punitive damages on an employer, the employees who acted wrongfully must have had sufficient authority to make the imposition of punitive damages fair and reasonable.

For these purposes, it is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the

workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers). For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case and might be accompanied by special interrogatories when several officers are presented as members of "upper management."

## IV

### Application of the *Lehmann* Principles.

In *Maiorino v. Schering–Plough Corp.*, 302 *N.J.Super.* 323, 695 *A.*2d 353 (App.Div.), *certif. denied,* 152 *N.J.* 189, 704 *A.*2d 19 (1997), the court observed that "a jury charge on punitive damages must include the instruction that upper management has to have ... participated in or shown willful indifference to the situation." *Id.* at 354–55, 695 *A.*2d 353 (emphasis added) (citing *Rendine, supra,* 141 *N.J.* at 314, 661 *A.*2d 1202). In fact, the court held that this concept is so essential to a fair trial that "the failure to charge the jury with the necessity of finding upper management's involvement to justify a punitive award is such a fundamental flaw that [an appellate court] must recognize it as a matter of plain error." *Id.* at 354, 661 *A.*2d 1202 (citation omitted). Although *Maiorino* is persuasive authority regarding the substantive correctness of a jury charge, it is well established that the question of whether plain error occurred depends on whether the error was clearly capable of producing an unjust result. Relief under the plain error rule, *R.* 2:10–2, at least in civil cases, is discretionary and "should be sparingly employed." *Ford v. Reichert,* 23 *N.J.* 429, 435, 129 *A.*2d 439 (1957).

In ruling on the punitive damages issue, the Appellate Division found that although the record contained sufficient evidence for a jury to conclude that Finn had engaged in the requisite especially egregious conduct in connection with the retaliatory discharge claim, the record was inadequate for the court to determine, as a matter of law, whether Finn was upper management. Finding the analysis of the especially egregious conduct and the involvement by upper management therein as intertwined, the court directed that the issue of liability for punitive damages be retried with correct jury instructions.

NJT argues that Finn, as Superintendent of the Raritan Valley Line, and Smith, as General Superintendent of the Newark Division, cannot be considered a part of NJT's "upper management" such that their conduct may be used to impose punitive damages upon NJT. Pursuant to statute, NJT is governed by a seven-member board, *N.J.S.A.* 27:25–4(b), with authority to delegate its powers and duties to subordinate officers of the corporation, *N.J.S.A.* 27:25–5(q). The Board also appoints NJT's Executive Director, *N.J.S.A.* 27:25–15, who is generally in administrative charge of all activities of NJT. In turn, the Executive Director exercises authority to designate an Executive Management Team, which along with the Executive Director constitutes NJT's upper management. According to NJT, Finn and Smith are not upper management under this organizational scheme.[4]

If conduct only by this uppermost-tier of employees constituted conduct of NJT, the LAD would, for all practical purposes, be inapplicable to NJT. Justice Blackmun once reminded us that participating in the management of an enterprise does not require

---

[4] NJT contends that in addition to the Executive Director, the following position titles constitute upper management and are commonly referred to as the Executive Management Team ("EMT"): Senior Director New Rail Construction; AED Engineering Development & Construction; AED Marketing & Communication; AED Procurement & Support Services; AED Administration; AED Planning; AED External Affairs; VP/GM NJ Transit Bus Operations, Inc.; VP/GM NJ Transit Rail Operations, Inc.,; CFO/Treasurer; Auditor General; Board Secretary; and NJ Transit Chief of Police.

one to "conduct [the] orchestra." *Reves v. Ernst & Young*, 507 *U.S.* 170, 187, 113 *S.Ct.* 1163, 1174, 122 *L.Ed.*2d 525, 542 (1993) (Souter, J. dissenting), *appeal after remand sub nom.*, *Robertson v. White*, 81 *F.*3d 752 (8th Cir.), *on remand sub nom.*, *Reves v. Ernst & Young*, 937 *F.Supp.* 834 (1996). And in *Young, supra*, Judge Posner wryly observed:

> The defendant argues absurdly, in the teeth of its own policies as well as of good sense, that in a corporation the size of Bayer the head of a department of "only" 60 workers is too far down the corporate ladder to count. Most companies do not have as many as 60 workers. A company does not buy effective immunity from the duties that Title VII places on employers merely by growing to a point at which it has many layers of supervisory employees or by slotting in additional layers, so that whereas in a company with 60 employees notice to the president would clearly suffice as notice to the company, in a company of 20,000 employees notice to a supervisor of 300 employees might not be enough because there were several supervisory layers between himself and the president or board of directors. Very small companies are exempted from Title VII. 42 *U.S.C.* § 2000e(b). This is the first time we've heard it argued that very large ones are, too.
>
> [123 *F.*3d at 674 (citations omitted).]

Finn or Smith could be found by a jury to be regional managers for NJT. At a retrial, focus should be on whether Finn or Smith had the authority to execute the organization's employment practices.[5] One or both appear to be the person or persons whom the jury could find controlled the day-to-day operations of the Raritan Valley branch; could hire, fire and discipline employees; and set the atmosphere of work. In addition, Smith could be found to be the person to whom Cavuoti should bring his employment problem and who would have the power "to do something about it," or at least relay the complaints to someone who could. Because the issues of liability for the acts of "upper management" are intertwined with the qualitative nature of the misconduct, the issues of both liability and damages should be retried.

---

[5] Less clear to us is the status of Joseph Allen. It was argued to us that Joseph Allen was not a personnel officer, but rather one who performed ministerial tasks in the issuance of pink slips. *See Spencer v. Bristol-Meyers Squibb Co.*, 156 *N.J.* 455, 720 A.2d 601 (1998) (discussing important role of that personnel officer in employment hierarchy). The trial court can better determine whether a jury could find that Allen meets the definition of "upper management."

## V

## Under the LAD, Punitive Damages Are Recoverable Against Public Entities.

In *Abbamont, supra*, 138 *N.J.* 405, 650 *A.*2d 958, three members of an equally-divided Court affirmed the majority decision of the Appellate Division, reported at 269 *N.J.Super.* 11, 634 *A.*2d 538 (1993), holding that punitive damages were available against public entities under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –129 (CEPA). In that opinion, Justice Handler explained more fully why punitive damages may be imposed under CEPA. He wrote:

> The legislative history buttresses the conclusion that punitive damages are recoverable under CEPA. In 1990, the Legislature amended both CEPA and LAD to grant plaintiffs the right to a jury trial and to make available to prevailing parties those remedies available in common-law torts. In so doing, the Legislature expressly reversed *Shaner v. Horizon Bancorp.*, 116 *N.J.* 433, 561 *A.*2d 1130 (1989), in which this Court ruled that a plaintiff bringing a LAD action was neither entitled to a jury trial nor the traditional remedies available in such a trial. Moreover, the failure of the legislation to exclude in CEPA an immunity from punitive damages or to refer to TCA is significant.
>
> [*Abbamont, supra*, 138 *N.J.* at 428, 650 *A.*2d 958.]

We acknowledged the strength of the considerations militating against punitive damages against governmental bodies. Nevertheless, as the Appellate Division observed in *Abbamont*, "the Legislature obviously considered these reasons when it enacted CEPA; yet the legislature made no exception for public entities regarding punitive damages relief." 269 *N.J.Super.* at 30, 634 *A.*2d 538.

That same reasoning applies with equal force to the LAD, and we adopt it for the reasons more fully stated in *Abbamont*. Our holding in *Abbamont* reflected our understanding of the LAD. In *Fuchilla v. Layman*, 109 *N.J.* 319, 330–32, 537 *A.*2d 652, *cert. denied sub nom., University of Med. and Dent. of N.J. v. Fuchilla*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988), the Court had ruled that the notice provisions of the Tort Claims Act [TCA], *N.J.S.A.* 59:8–8 and –9, did not apply to LAD actions. The *Fuchilla* holding was based, in part, on the different purposes of

the two statutes. Awards under the LAD are intended to serve not only individual interests but the public interest, whereas the purpose of the TCA is to "provide compensation to tort victims without imposing excessive financial burdens on the taxpaying public." *Abbamont, supra,* 138 *N.J.* at 430, 650 *A.*2d 958 (quoting *Fuchilla, supra,* 109 *N.J.* at 335, 537 *A.*2d 652). Discrimination claims are dissimilar to claims envisioned by the Legislature to be included within the coverage of the [TCA] in part because "[d]iscriminatory conduct actionable under the [LAD] is more akin to the malicious or willful acts exempted from the [TCA] than the negligently or similarly inflicted injuries covered thereby." *Ibid.* (quoting *Fuchilla v. Layman,* 210 *N.J.Super.* 574, 579, 510 *A.*2d 281 (1986)).

Finally, we observed that the policy concerns regarding the imposition of punitive damages against public entities for LAD violations were addressed, in some measure, by the heightened standard that we adopted in *Lehmann* for imposing punitive damages.

In sum, a sensible and unconstrained reading of the language of the LAD, a consideration of the provisions of the LAD in light of the TCA, a review of the LAD's legislative history, an understanding of the underlying policy concerns in awarding punitive damages and an examination of LAD's remedial purposes persuade us that the LAD allows the award of punitive damages against public entities.

We are sustained in that conclusion by the Legislature's five-year acquiescence in the *Abbamont* interpretation of CEPA. There is ample precedent in New Jersey to support the proposition that, when a statute has been judicially construed, the failure of the Legislature subsequently to act is evidence of legislative acquiescence in the construction given to the statute. *See, e.g., Lemke v. Bailey,* 41 *N.J.* 295, 301, 196 *A.*2d 523 (1963), *Egan v. Erie R.R. Co.,* 29 *N.J.* 243, 250, 148 *A.*2d 830 (1959); *Caputo v. Best Foods, Inc.,* 17 *N.J.* 259, 267, 111 *A.*2d 261 (1955); *Miller v.*

*Board of Chosen Freeholders of Hudson Cty.,* 10 *N.J.* 398, 413, 91 *A.*2d 729 (1952).

VI

Other Issues

The Appellate Division found no need to discuss in any detail the remaining issues. For completeness of the record, we note our agreement with its disposition of those issues.

 Specifically, we agree that defendant was not prejudiced by the admission of other discrimination complaints against NJT. In *Rendine, supra,* 141 *N.J.* at 309–11, 661 *A.*2d 1202, we discussed federal court decisions that had excluded testimony of other employees claiming discriminatory treatment analogous to that asserted by a claimant. In those federal cases the evidence was held to be inadmissible as irrelevant because, for example, the employees had worked in offices distant from the claimant and under different managers. The general rule is that it is within the discretion of a court to allow evidence of prior acts relevant to show the motive, intent, or the plan of defendants in discrimination cases. *See, e.g., Hogan v. American Telephone & Telegraph Co.,* 812 *F.*2d 409, 410–11 (8th Cir.1987). We are satisfied, however, that a fair reading of the trial transcript in this case shows that the evidence of other discrimination complaints against NJT was not offered to show that NJT had a generic problem with employees who filed discrimination cases. The evidence of prior complaints simply arose in the course of cross-examining a witness from NJT's compliance office about how he could recall plaintiff's complaint from memory. We also agree that it was not necessary to apply *St. Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 113 *S.Ct.* 2742, 125 *L.Ed.*2d 407 (1993), to this case. The principle in *Hicks* is that a plaintiff is not automatically entitled to a judgment as a matter of law once the claimant has proved that the proffered reasons for the job action were a pretext. That error did not occur here. Finally, there is no evidence that the trial court

abused its discretion by allowing plaintiff to amend his complaint to add his retaliation claim shortly before trial. The trial court found that defendant would not be prejudiced. We agree that a claim for future lost wages (front pay) is to be decided by a jury and not a judge.

The judgment of the Appellate Division is affirmed.

POLLOCK, J., concurring in part and dissenting in part.

Except for its holding that a public entity is subject to an award for punitive damages under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -42, I join in the Court's opinion. The Tort Claims Act (TCA) provides that "[n]o punitive or exemplary damages shall be awarded against a public entity." *N.J.S.A.* 59:9-2. Nothing in the LAD expressly or impliedly repeals that provision. As the Court acknowledges, the LAD simply provides that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs." *N.J.S.A.* 10:5-13. The absence of an exception for public entities suggests not that the Legislature intended that public entities would be subject to claims for punitive damages, but that the TCA, including its ban on punitive damage awards, would continue to apply to such entities.

Five years ago, in *Abbamont v. Piscataway Board of Education*, 138 *N.J.* 405, 435-36, 650 *A*.2d 958, I likewise dissented from the Court's holding that under the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-1 to -9, claimants are entitled to punitive damages. The authorization for the award of punitive damages under CEPA, which specifically authorize such damages, *N.J.S.A.* 34:19-5f, is even clearer than that in the LAD. Then, as now, I doubt that in either the CEPA or the LAD the Legislature intended to saddle taxpayers with the ultimate obligation for paying punitive damage awards. Also, I doubt that the Legislature intended in either statute to impose on rate payers, such as the people who ride the New Jersey Transit trains and buses, the ultimate cost of paying punitive damage awards. Such awards in CEPA and LAD cases can be substantial. Here, for

example, plaintiff was awarded $1,000,000 in punitive damages. Another recent case, which involved the sexual harassment of one prison guard by another, resulted in the award of $3,750,000 against the State, consisting of $750,000 for compensatory damages and $3,000,000 in punitive damages. Brian Donahue & Kathy Barrett Carter, $3.75M for Guard in No-sex Lawsuit, Star-Ledger, May 29, 1999. Such awards, which represent sums in addition to those needed to compensate claimants, can impose a heavy burden on the public.

As in *Abbamont,* "I believe that not permitting punitive damage awards against public employers is more consistent with the legislative intent. The best solution would be for the Legislature to revisit the issue and resolve it definitively." 138 *N.J.* at 436, 650 *A.*2d 958. Accordingly, I respectfully dissent from that part of the Court's opinion construing the LAD to subject New Jersey Transit to a claim of punitive damages.

Chief Justice PORITZ and Justice GARIBALDI join in this opinion.

*For affirmance*–Justices HANDLER, O'HERN, STEIN and COLEMAN—4.

*For concurrance in part; dissenting in part*—Chief Justice PORITZ, and Justices POLLOCK and GARIBALDI—3.