801 A.2d 322

MARIA GAINES, PLAINTIFF–APPELLANT, v. JOSEPH BELLINO
AND COUNTY OF HUDSON, DEFENDANTS–RESPONDENTS,
AND JOHN DOE, HUDSON COUNTY CORRECTIONAL FACILI-
TY AND DENNIS WOODS, DEFENDANTS.

Argued March 25, 2002—Decided July 24, 2002.

*Mark C.G. Lawrence* argued the cause for appellant (*Forman, Cardonsky, Andril & Eiges,* attorneys).

*Domenick Carmagnola* argued the cause for respondent Joseph Bellino (*Lum, Danzis, Drasco, Positan & Kleinberg,* attorneys).

*Ralph J. Lamparello* argued the cause for respondent County of Hudson (*Chasan, Leyner, Bariso & Lamparello,* attorneys; *John L. Shahdanian II,* on the brief).

The opinion of the Court was delivered by

LaVECCHIA, J.

In this case we must consider whether an employer implemented an effective anti-sexual harassment workplace policy such that the employer should be insulated from vicarious liability in a discrimination claim based on hostile work environment. The employer asserted below that although it had an anti-harassment policy and procedure in place, the aggrieved employee never filed a formal complaint. Accordingly, the employer was dismissed from the action on a motion for summary judgment.

Our review of the motion record, allowing the plaintiff employee all reasonable inferences in her favor, reveals that at trial a factfinder could conclude that the employer had in place an anti-harassment policy in name only. Because there are genuine factual issues concerning whether this employer had implemented an anti-sexual harassment workplace policy that provided realistic preventative and protective measures for employees in the event that harassment occurred, summary judgment should not have been granted. The factual disputes plaintiff raises, using more than mere assertions about her subjective perception of the workplace policy and complaint mechanisms, are material to the question whether, based on agency principles, the employer may be held vicariously liable for an alleged sexually hostile workplace.

We adhere to the principle that if an employer has exercised due care in acting to prevent a sexually discriminatory hostile work environment, vicarious liability should not attach. The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability. However, in this matter plaintiff has put into issue the effectiveness of this employer's anti-harassment policy and procedures and, thus, that issue is not determinable on the motion record.

I.

Because this matter was resolved on motion for summary judgment granted to the defendant employer, we consider the

facts in a light most favorable to plaintiff. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). However, we note that several key factual assertions are sharply disputed.

In August 1989, plaintiff, Maria Gaines, was hired by Hudson County as a Corrections Officer at the County Jail. The parties do not dispute that plaintiff received a copy of the County's Sexual Harassment Memorandum, dated December 9, 1988, upon commencing employment and received updates on the policy issued in the 1990 and 1994 Employee Handbooks. This case implicates those policies.

In 1998, plaintiff filed a verified complaint against her shift supervisor, Captain Joseph Bellino, and the County of Hudson Correctional Facility, alleging among other things violations of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to – 49(LAD), arising from sexual harassment constituting a hostile work environment. For purposes of this appeal only plaintiff's LAD claims are pertinent, all other claims having been abandoned. The following events are alleged.

In December 1990, plaintiff was assigned to the midnight shift in the section of the Hudson County Jail known as Modular One South. One evening while plaintiff was attending to her duties, Captain Bellino and Sergeant Montenez entered the room where she alone was working. Shortly thereafter, Montenez left to check another area of the jail. Plaintiff and Bellino conversed, but after awhile plaintiff rested her head down on her desk. Bellino called out her name and as plaintiff raised her head Bellino grabbed her face and kissed her, forcing his tongue into her mouth. Plaintiff pushed him away and tried to bite his tongue to make him stop. She screamed, "what the f— are you doing," and he responded, "I just wanted a kiss." Montenez then re-entered the room and Bellino left.

Immediately after the incident, plaintiff told Lavara Howard Ladson, another corrections officer working that night, about what had transpired. Ladson testified that plaintiff was shaking and

crying as she described the incident. Officer Ladson advised plaintiff to "write up" Bellino.

Later during that same shift, plaintiff also talked about the incident to Senora Williams, another corrections officer. Williams testified that plaintiff told her that Bellino forcibly kissed her and that plaintiff looked like she had been crying. Williams did not advise plaintiff to report the incident, but she did encourage plaintiff to "watch herself." Williams also testified that she heard rumors around the jail that Bellino was "connected to the mafia."

In addition, Officer Minnie Perez testified that plaintiff telephoned her at home on that same night and recounted the incident to her. Perez described plaintiff as "hysterical." Perez also recommended that plaintiff "report" Bellino, but plaintiff responded that no one would believe her and that she was afraid for her safety because she feared Bellino. Perez stated in her testimony that if plaintiff had reported the incident, the allegation would not have been credited.

The next workday, believing that Montenez and Bellino had arranged the incident that occurred at Modular One South, plaintiff confronted Sergeant Montenez. He denied any involvement and told plaintiff that if Bellino forcibly kissed her, she should report him.

Plaintiff also informed Sergeant Pedro Arroyo that Bellino forcibly kissed her. Although Arroyo advised plaintiff to "write it up," he testified that he did not inform anyone about the incident. He did not consider plaintiff's recitation of the event to him to be a complaint. However, Arroyo did testify that he was worried that he would be charged for failing to report the incident. When asked whether in retrospect he thought that he should have reported the incident, he responded, "I wasn't trained, right, I wasn't trained." According to Arroyo, he had not had any anti-sexual harassment training as of the time that he was told by plaintiff about her incident with Bellino.

In January 1991, plaintiff and Bellino had a second encounter. While both were working the midnight shift, Bellino instructed plaintiff to accompany him to the construction site for a new jail facility. The site was dark and Bellino used a flashlight to illuminate their path. During their walk to the site, Bellino brought up the kissing incident and assured plaintiff that he "would not force himself" on her again and that he would protect her. Plaintiff stated that she appreciated the offer, but she declined his "protection." Plaintiff informed Bellino that she wanted to return to her post. However, Bellino blocked her exit with his arm, repeating his message that he did not want her to be afraid.

Although plaintiff perceived Bellino's actions in January 1991 at that time as a form of an "apology," he continued to bring up the kissing incident. In 1993, Bellino raised the incident with another high-ranking officer, Captain Kelly, in plaintiff's presence. Plaintiff testified that Bellino was remarking about her red lipstick and then proceeded to tell Captain Kelly what had occurred in Modular One South. Bellino told Kelly that he kissed plaintiff and that her body "shivered" in response. Plaintiff testified that "Captain Kelly laughed ... and he started covering his ears like he always does." According to plaintiff, Bellino also raised the kissing incident in 1995 with Captain Joseph Flynn, again pointedly in plaintiff's presence. Flynn was the Tour Commander on the midnight shift from 1993 to 1995, rendering him the top-ranking officer during the time that both he and Bellino served as captains on the midnight shift. According to plaintiff, Bellino told Flynn about kissing plaintiff, and that when he kissed her her body "shivered." Plaintiff angrily responded, telling Bellino that if he did that again, she was going to "kick [his] a—." Flynn laughed. Then Bellino said, "[w]hat if I rape you, you know nobody will believe you." Flynn told Bellino to stop, but he continued. Bellino said, "[i]t is true, who will believe her .... What about me and you [Flynn], if we raped her." Plaintiff was visibly angry, so Flynn again told Bellino to stop. At that point, Lieutenant Dave Krusznis entered the office and Bellino continued, "[w]hat about

me, [Krusznis] and [Flynn]" raping plaintiff. Krusznis agreed, stating "[w]ell, Gaines, nobody would believe you." Plaintiff attempted to exit the room, but Bellino blocked her exit. Flynn told Bellino that plaintiff was "serious" and he should "stop playing."

Plaintiff went to the lavatory to put cold water on her face. She then encountered another officer. Without explaining to that officer the details of what had just transpired, plaintiff stated, "if something happens to me inside that tour commander's office, I want you to know that it's all Bellino's fault." Plaintiff walked back into the office to retrieve her belongings and she heard Bellino continuing to discuss the "rape." Plaintiff asked Flynn and Krusznis how they could tolerate Bellino's behavior. Plaintiff threatened that if Bellino raped her, she would kill him.

According to defendants, in mid- to late 1993 Warden Green began receiving anonymous calls from a female caller regarding activities that allegedly were occurring during the midnight shift at the jail. When he was seeking information about the anonymous caller, Warden Green was advised by Sergeant Montenez to contact plaintiff. Thus, Green became aware sometime in 1994 of plaintiff's allegations against Bellino.

However, Green did not contact plaintiff until March 1995. In that interview, plaintiff told the warden that she believed that she was being retaliated against in that she was being moved from post to post because she had had a "sexual encounter" with Bellino in the late eighties or early nineties. Although plaintiff informed the warden that she believed she was being retaliated against because "she was not cooperating," she did not detail further any instance of sexual harassment. Green asked plaintiff if she wanted to file a complaint, but plaintiff refused stating that she was afraid for her safety. Green testified, "[a]t that point, she said she did not want to file, so I had to pretty well leave that alone until I could talk with her at a later date, she appeared to be highly upset at the time."

Later in 1995, plaintiff and Warden Green had another conversation. Green informed plaintiff that the Employee Handbook

had a complaint form in it and he advised her to file a complaint. Again she refused. Following his conversations with plaintiff, Green issued a "cease and desist letter" against Bellino and Flynn. Green explained that a "cease and desist letter" is issued anytime someone complains of sexual harassment. The letter instructed the other parties to cease and desist any communications or action that had been taking place prior to the letter. Despite Green's issuance of the letter, he could not recall its precise terms. Green also testified that an Internal Affairs Investigation had begun, but he could not provide any details about the results because the State had taken over supervision of the facility and he "wasn't there."

No further events took place until June 1996 when plaintiff's allegations of sexual harassment were brought to the attention of Lawrence Henderson, Hudson County's Director of Personnel. Mike Dermody, Assistant Hudson County Counsel, reported to Henderson that plaintiff testified in a deposition in a separate matter that she had been sexually harassed. Soon after learning of the allegation, Henderson contacted plaintiff.

Plaintiff told Henderson about the Modular One South incident. Plaintiff stated that she wanted Henderson to meet with Bellino and to tell him to leave her alone, and to stop spreading false allegations that she was going to be brought up on charges. Nonetheless, she remained uncertain whether she wanted to file a complaint. During August and September 1996, Henderson interviewed various individuals that plaintiff said had knowledge of her allegations.

In December 1996, the County filed disciplinary charges against Bellino for his harassing behavior. A hearing was held on February 26 and March 6, 1997. The hearing officer concluded that although the "kissing incident" had been proven, that charge as well as the other charges against Bellino should be dismissed because the charges as a whole "only involved one touching incident" and Bellino had no prior disciplinary convictions. As an "alternative" to dropping the charges, the hearing officer recom-

mended that the County suspend Bellino without pay for thirty days. The County suspended Bellino. Shortly thereafter, Bellino retired.

Although the County asserted that an "anti-sexual harassment workplace policy" was in place throughout the period of time encompassing plaintiff's allegations, numerous employees, including Bellino, testified that they never received any training concerning that policy. Nonetheless, Henderson testified that beginning in 1990 managerial staff was responsible for assuring that employees attended sexual harassment seminars.

The County's Employee Handbooks issued in 1990 and 1994 stated that an employee could report allegations of sexual harassment to another supervisor if his or her supervisor was the alleged harasser. The policy statements instructed that, in pertinent part, "[e]mployees who believe it would be inappropriate to discuss the matter with their supervisor should report it to another supervisor or County official." Notwithstanding that "bypass" mechanism, Henderson testified that if any employee on the midnight shift experienced sexual harassment, the employee was to report that behavior to Captains Flynn or Bellino because they were responsible for ensuring that there was no sexual harassment on that shift.

Also, conflicting testimony was presented on anti-harassment policy notification to employees. Henderson testified that anti-sexual harassment signs were placed in the jail at least as early as 1990. However, Warden Green testified that he first posted a sign that said "Sexual Harassment equals zero tolerance" in the lobby of the jail in the early part of 1997. Montenez testified that the only anti-sexual harassment sign he observed in the jail was the 1997 sign. Further, Ladson, Conti, and Williams testified that although they recalled receiving the 1990 and 1994 Employee Handbooks that included a section containing a statement of the anti-sexual harassment policy, no one directed their attention to that specific section.

Finally, plaintiff presented evidence that the County's policies were loosely enforced in the jail. According to Officer Williams,

"the whole policy and procedure book is not enforced on everyone." She testified that the supervisory staff enjoyed freedom from restrictive or prohibitory policies, especially Bellino. Even Warden Green testified that although it was prohibited for an employee to have another employee work his or her shift for him, Bellino was known to hire others to work his shift. Green also stated that Bellino violated the dress code by coming to work in civilian attire instead of wearing his uniform as required. Moreover, Green testified that if an employee wanted outside employment, the employee was required to make a written request for approval of such employment. Green acknowledged that Bellino had outside employment, but he was not sure whether permission had been granted; he assumed that Bellino was granted permission before Green arrived at the facility, but did not act to verify that assumption.

As noted, defendants moved for summary judgment on plaintiff's complaint. Defendants asserted three arguments, but only one is significant for purposes of this appeal: that the County had taken sufficient preventative steps in respect of sexual harassment such that no material issues of fact existed on the issue of its vicarious liability. For purposes of its motion, the County did not contend that plaintiff failed to prove a *prima facie* case of hostile workplace sexual harassment. Defendant Bellino, on the other hand, maintained that plaintiff's complaint against him individually had to be dismissed because only employers may be directly liable under LAD, and that if the County is not liable he could not be held individually liable on an aiding and abetting theory.

The trial court granted defendants' motions and dismissed plaintiff's complaint in its entirety against the County and Bellino. The trial court stated:

> The policy was known to the plaintiff. The policy was known to the superior officers on the midnight shift.
>
> The fact that somebody violated a policy doesn't mean the policy was wrong. You can't go by hindsight and say the policy is ineffective because somebody violated the policy.
>
> They have a policy here that goes all the way back to 1988 … its pre-[*Lehmann*].

The plaintiff knew the policy. She didn't choose [sic] to report it. When it was brought to the attention of higher authorities, they acted.

I agree with the language used by [defense counsel], that the employer is immunized in these circumstances. I don't know that anybody who does violate the policy should get a medal for it, but you can't use hindsight to determine the policy as being effective.

If you bring something to the attention of the authorities and they correct it, fine. We have here a handful of incidents over a period of years from 1990 to 1995.

And to say that the [C]ounty did not have a policy in place is wrong. You cannot say because somebody claims harassment that the policy was ineffective.

The person who allegedly violated the policy knew the policy, so I don't see how the [C]ounty can be responsible.

That *Nordstrom* case makes sense to me. The federal cases make sense. So, I have to grant summary judgment for the [C]ounty on this situation.

With respect to Mr. Bellino, there's no individual liability under the statute, unless you can get into the aiding and abetting type situation, which I do not see here. So, he is not responsible in that sense.

Plaintiff appealed only the dismissal of her LAD claims against the County and Bellino, and the Appellate Division affirmed, applying *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993).[1] The court assumed in its review of the summary judgment motion that plaintiff established a claim of hostile workplace harassment under the LAD and that Bellino was plaintiff's supervisor. With those assumptions in mind, the court considered whether the County should be held liable as plaintiff's employer for Bellino's harassment. The panel noted that defendant had a policy, publicized it through posters, promulgated it through successive editions of employee handbooks, conducted training, and acted when facts were brought to its attention. Moreover, the court observed that once the County learned of the alleged harassment, it disciplined Bellino. Accordingly, the court held that the County was insulated from vicarious liability for plaintiff's alleged harassment. We granted certification, 170 *N.J.* 388, 788 *A.*2d 772 (2001).

---

[1] The court acknowledged that defendants withdrew their defense based on the statute of limitations for LAD claims.

## II.

In *Lehmann,* we considered what standards should apply when assessing employer liability under the LAD for various forms of relief, including equitable relief, compensatory damages, and punitive damages. *Supra,* 132 *N.J.* at 616, 626 *A.*2d 445. Although an employer is strictly liable for equitable relief, we concluded that different standards should apply when assessing employer liability for compensatory and other damages. *Id.* at 617, 626 *A.*2d 445.

We determined that principles of agency law should control employer liability for compensatory damages in cases of supervisory hostile work environment sexual harassment claims. *Id.* at 617–619, 626 *A.*2d 445. We adopted section 219 of the Restatement (Second) of Agency as the fitting construct for the agency analysis. *Ibid.* Section 219 recognizes that:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[*Restatement (Second) of Agency,* § 219 (1958).]

Thus, we explained that if a supervisory employee is acting within the scope of his or her employment, an employer will be liable if the supervisor's conduct creates a hostile work environment. *Lehmann, supra,* 132 *N.J.* at 619, 626 *A.*2d 445. Even if a supervisor were to act beyond the scope of his or her employment, the employer may be liable for that supervisor's discriminatory behavior under one of the exceptions identified in section 219(2). *Id.* at 619–20, 626 *A.*2d 445.

If an employer delegates to a supervisor the authority to control the work environment and the supervisor abuses that authority, vicarious liability may be found to exist under section 219(2)(d).

*Id.* at 620, 626 *A.*2d 445. The question whether a supervisor, who creates a hostile work environment, was aided by delegated power to control the day-to-day work environment is a fact-sensitive inquiry. *Ibid.* We posited several questions as relevant to the inquiry:

1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains?

2. Did the supervisor exercise that authority?

3. Did the exercise of authority result in a violation of [the LAD]?

4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?

[*Ibid.* (citation omitted).]

If those questions are answered in the affirmative, the employer may be vicariously liable under section 219(2)(d) for the hostile workplace environment created by the supervisor. *Ibid.*

In *Lehmann,* we also identified section 219(2)(b) of the Restatement (Second) of Agency as an alternative basis in negligence for employer liability. *Id.* Although a bright-line rule was not established for the standard of negligence required in sexual harassment claims, several factors were identified as being relevant to determining whether an employer had acted negligently in failing to establish an anti-harassment policy in its workplace. *Ibid.* Those factors included the existence of: (1) formal policies prohibiting harassment in the workplace; (2) complaint structures for employees' use, both formal and informal in nature; (3) anti-harassment training, which must be mandatory for supervisors and managers, and must be available to all employees of the organization; (4) the existence of effective sensing or monitoring mechanisms to check the trustworthiness of the policies and complaint structures; and (5) an unequivocal commitment from the highest levels of the employer that harassment would not be tolerated, and demonstration of that policy commitment by consistent practice. *Ibid.* We stated that the absence of effective preventative measures would present strong evidence of an employer's negligence in respect of the duty of due care to prevent harassment in the workplace. *Id.* at 622, 626 *A.*2d 445. Although

the existence of effective preventative mechanisms may provide evidence of due care on the part of the employer, we refused to hold that the absence of such mechanisms, or any part of them, automatically constituted negligence, and we similarly rejected the converse proposition that the presence of such mechanisms categorically demonstrated the absence of negligence. *Id.* at 621–22, 626 *A.*2d 445. *See also Payton v. New Jersey Turnpike Auth.,* 148 *N.J.* 524, 535–38, 691 *A.*2d 321 (1997) (discussing employer liability generally and stressing importance of effective anti-sexual harassment policy; stating "[w]hile the effectiveness of an employer's remedial steps relates to an employee's claim of liability, it is also relevant to an employer's affirmative defense that its actions absolve it from all liability"). The efficacy of an employer's remedial program is highly pertinent to an employer's defense. *Id.* at 537, 691 *A.*2d 321.

In *Cavuoti v. New Jersey Transit Corporation,* 161 *N.J.* 107, 120–21, 735 *A.*2d 548 (1999), we further acknowledged that employers who promulgate and support an active anti-harassment policy should be entitled to a form of safe haven from vicarious liability from an employee's harassing conduct of others. We underscored that for an employer to enjoy the benefit of that protection, the following circumstances would be relevant: periodic publication of the employer's anti-harassment policy, the presence of an effective and practical grievance process for employees to use, and training for workers, supervisors, and managers concerning how to recognize and eradicate unlawful harassment. *Id.* at 121, 735 *A.*2d 548. Since *Cavuoti,* this Court has not elaborated further on an employer's affirmative defense to a LAD claim based on the alleged existence of an effective anti-harassment policy. See *Mancuso v. City of Atlantic City,* 193 *F.Supp.*2d 789, 796–807 (D.N.J.2002) (examining employer's defense to vicarious liability in context of LAD claim); *Newsome v. Administrative Office of the Courts,* 103 *F.Supp.*2d 807, 821–22 (D.N.J.2000) (observing that agency analysis employed in *Lehmann* continues to govern LAD claims).

### III.

#### A.

■ Plaintiff contends that the Appellate Division misapplied *Lehmann's* principles. Specifically, plaintiff argues that the court failed to recognize that material issues of fact implicate at least two of the factors relevant to the question of employer liability under section 219(2)(b) of the Restatement (Second) of Agency: (1) training, which must be mandatory for supervisors and managers and must be offered for all members of the organization; and (2) effective sensing or monitoring mechanisms to check the trustworthiness of the prevention and remedial structures available to employees in the workplace.

Concerning the first issue, training, plaintiff points to the testimony of defendant Captain Bellino, as well as Officers Lavara Howard Ladson, Senora Williams, and Rosemarie Conti, all of whom unequivocally stated that they did not receive any sexual harassment training from the County. Other officers who tentatively recalled participating in a training program did not receive such training from the County. Although plaintiff raises factual issues concerning what training, if any, ever was provided by the County to reinforce its espoused anti-harassment policy, we need not decide whether that alone should prevent defendants from being dismissed from this action on a motion for summary judgment. Plaintiff also raises serious factual issues about the County's monitoring and sensing of its workplace anti-harassment policy that, in our view, require submission of the effectiveness of that policy to jury scrutiny.

Plaintiff challenges the legitimacy of defendant's anti-harassment policy when she states that she did not report the kissing incident because she was afraid of Bellino and perceived that her allegations would not be credited. Although the Appellate Division recognized that plaintiff was afraid to report Bellino's actions and that a more effective policy might have eliminated her concerns, the panel regarded plaintiff's fears as unsubstantiated and

therefore unable to provide a basis on which to declare the anti-harassment policy ineffective. We perceive this motion record as clearly not supporting the summary disposition granted to defendant.

Notwithstanding plaintiff's verbal reporting of the kissing incident to several superior officers, those informal reports of harassment failed to result in any remedying of plaintiff's vulnerability to Bellino, whom she feared. Plaintiff explained her reasons for being reluctant to file a formal harassment complaint. She perceived the formal reporting of the incidents to be of no avail because she believed that nothing would change for her and she feared some form of retribution from Bellino, one of the supervisors on her midnight shift. Importantly, this record is not based solely on plaintiff's subjective perceptions of the value of resort to the County's anti-harassment policy and procedure. The record reflects that although Officer Perez initially encouraged plaintiff to report Bellino's behavior, she too testified that if plaintiff had filed a formal report about the incident, she would not be believed. Thus, a complaint also was perceived to be of no avail by others in pre-trial testimony. Accordingly, plaintiff did not present only her own unsupported subjective perceptions of the efficacy of reporting an instance of sexual harassment.

Moreover, as noted, although plaintiff did not file a formal written complaint, she did protest orally to several co-workers and superior officers immediately after the incidents of harassment took place. The response by higher level officers, and the reaction of co-officers, fails to support any workplace confidence in the existence of a meaningful anti-sexual harassment policy. Indeed, the record here could support a jury finding that the supervisors placed in responsibility for the jail, and for the shift to which plaintiff was assigned, had been permitted to create an atmosphere where such allegations were brushed aside, ridiculed, or viewed as cause for retribution. Plaintiff testified that when Bellino described the "kissing incident" to Captain Kelly back in 1993, Captain Kelly covered his ears. The message to plaintiff

and others was that supervisors and management did not want to hear about and have to act on sexually harassing behavior in the workplace.

Plaintiff's argument that the County failed to employ a meaningful sensing and monitoring mechanism to assess the soundness of its anti-harassment policy is further supported by her testimony, if believed, that Flynn and Krusznis actually participated in the 1995 "rape" discussion. Both Bellino and Krusznis reinforced the notion that no one would believe (and, implicitly, no one would act on) plaintiff's claims of harassment. Flynn and Krusznis were high-ranking employees of the County and although Flynn attempted to discourage Bellino's comments, neither Flynn nor Krusznis reported the alleged outrageous "rape" discussion. Thus, the Appellate Division's conclusion that Flynn attempted to put an end to Bellino's harassing conduct by telling him to "stop" is a weak reed on which to base summary dismissal of plaintiff's cause of action.

Further, Krusznis participated in the discussion by adding, "[w]ell, Gaines, nobody would believe you." Not only is the subject of the conversation (a suggested multiple rape) highly offensive, the implicit point being made to plaintiff was that the higher-up officials would bond together to prevent the truth from being disclosed. That evidence, albeit contradicted by Flynn's and Bellino's sworn statements, raises an issue of fact concerning the County's sensing and monitoring of its asserted anti-harassment policy. Resolution of that factual dispute will fundamentally affect the fact-finder's conclusion concerning whether the employer exercised due care to prevent sexual harassment and the creation of a hostile working environment.

In sum, defendants' claim to an anti-harassment policy is contradicted by the facts plaintiff has put in issue. Although Bellino's harassment was known to many high-ranking officials at the corrections facility (Arroyo, Montenez, Flynn, and Krusznis) because of plaintiff's informal complaints about Bellino's behavior, no apparent action was taken to address those complaints. The

County's defense to this cause of action has been to focus attention on plaintiff's failure to file a formal complaint. That alone is insufficient to entitle defendants to an affirmative defense insulating the County from liability for an alleged hostile work environment caused by one of its highest ranking officers.

Plaintiff's failure to file a formal complaint must be considered in the context of whether the County had been negligent in combating the creation of a sexually discriminatory hostile work environment by failing to establish meaningful and effective policies and procedures for employees to use in response to harassment. Plaintiff's co-officers have provided testimony disputing the County's assertion that its complaint mechanism provided meaningful assistance to an employee who sought to complain about harassment from Captain Bellino. The County's failure to monitor the effectiveness of its asserted anti-harassment policy and mechanisms is further brought into question by Warden Green's indecisive reaction following his first discussion with plaintiff. And finally, plaintiff's and Officer Williams's assertions that defendant's anti-harassment policy was ineffective is bolstered by Warden Green's testimony that supervisors generally, and Bellino notoriously, had violated numerous County policies in the past. According to the proofs adduced by plaintiff in the motion record, the County had little basis for assuming employee confidence in the steadfastness of its anti-harassment policy.

Defendants argue that plaintiff's proofs are thin. That noted, on a motion for summary judgment plaintiff is entitled to have all reasonable inferences in her favor. Her complaint should not have been summarily dismissed. Plaintiff is entitled, on the basis of the material facts that she has shown to be disputed, to have a fact-finder determine whether the County's anti-harassment policy provided effective and practical anti-harassment prevention and protection mechanisms that shield the County from liability for the alleged wrongdoings by Bellino, or whether it was an anti-harassment policy that existed in name only.

As expressed in *Lehmann,* an employer's sexual harassment policy must be more than the mere words encapsulated in the policy; rather, the LAD requires an "unequivocal commitment from the top that [the employer's opposition to sexual harassment] is not just words[,] but backed up by consistent practice." *Lehmann, supra,* 132 *N.J.* at 621, 626 *A.*2d 445. The "mere implementation and dissemination of anti-harassment procedures with a complaint procedure does not alone constitute evidence of due care—let alone resolve all genuine issues of material fact with regard to due care." *Newsome, supra,* 103 *F.Supp.*2d at 822. In *Lehmann,* this Court recognized that although the "existence of effective preventative mechanisms provides some evidence of due care on the part of the employer[,] . . . given the foreseeability that sexual harassment may occur, the absence of effective preventative mechanisms will present strong evidence of an employer's negligence." *Lehmann, supra,* 132 *N.J.* at 621–62, 626 *A.*2d 445. Because plaintiff has presented factual issues that pertain to whether the County had an effective policy, the County's alleged negligence under section 219(2)(b) cannot be resolved on summary judgment. Plaintiff is entitled to a jury's evaluation of the alleged facts.

## B.

Plaintiff also has not abandoned her argument that the County should be held vicariously liable for the alleged hostile work environment under section 219(2)(d) of the Restatement (Second) of Agency because defendant Bellino's sexually harassing conduct was aided by his agency relationship with the County. Plaintiff contends that she was under Bellino's control when working on the midnight shift. Further, although Bellino's power was subject to Flynn's authority as tour commander, plaintiff asserts that Bellino nonetheless had unquestionable authority over all lieutenants, sergeants, and officers in the jail during his shift. Plaintiff highlights that in January 1991, Bellino instructed her to accompany him to the construction site for the new jail, an

instruction that she felt compelled to obey. Furthermore, plaintiff claims that Bellino "bounced her from post to post" and threatened to have her written-up for procedural violations after the kissing and other incidents occurred.

Notwithstanding those claims, it is apparent that the record contains conflicting assertions. The scope of Bellino's alleged authority is sharply disputed by both Bellino and Flynn. Because genuine issues exist concerning whether Bellino was aided by his agency relationship with the County, plaintiff's cause of action should not have been dismissed on a motion for summary judgment. Whether brought under a section 219(2)(d) theory, or under a section 219(2)(b) theory, her claim should have survived a motion for summary judgment and the factual disputes presented to the trier of fact.

## IV.

■ A defendant is entitled to assert the existence of an effective anti-sexual harassment workplace policy as an affirmative defense to vicarious liability; however, material issues of disputed fact in the context of a motion record can deny a defendant summary dismissal based on that defense. Here, the record contains numerous factual disputes, based on plaintiff's perceptions and other evidence, that raise serious questions concerning the effectiveness of the County's policy. Having presented colorable material issues, plaintiff should have the opportunity to prove that the County may be liable vicariously for sexual harassment in the workplace because the County's anti-harassment policy was no more than words, its effectiveness at preventing harassment and protecting employees undermined to the point that the County should not be protected from liability. Summary judgment should not have been granted to defendants.

The judgment of the Appellate Division is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.