Justice ALBIN,
dissenting.
The majority opinion turns back the dock for employees victimized by sexual harassment in the workplace and gives greater protection to supervisors who abuse their authority to create a hostile work environment. Today’s decision tears down the central pillar of our landmark decision in Lehmann v. Toys ‘R’ Us, 132 N.J. 587, 626 A.2d 445 (1993), which announced that an employer would be vicariously liable for sexual harassment committed by one of its supervisors. Lehmann allowed no quarter for supervisory sexual harassment and provided for no affirmative defense for the employer. We said so in clear, unmistakable terms, leaving no doubt that under New Jersey’s Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, this State’s workers had safeguards not present under federal law.
The Appellate Division, the United States District Court of New Jersey, and the New Jersey Supreme Court Committee on Civil Jury Charges all recognized that under Lehmann, when the supervisor is the sexual harasser, the employer has no affirmative defense and cannot hide behind a paper anti-discrimination policy. Civil Jury Charge 2.25 reaffirmed in 2013 what we said twenty years earlier in Lehmann—that an employer is vicariously liable if a supervisor creates a hostile work environment through sexual harassment. Model Jury Charge (Civil) 2.25 “Hostile Work Environment Claims Under the New Jersey Law Against Discrimina *532 tion (Sexual and Other Harassment)” (February 2013). Trial courts have been guided by that charge for eighteen years. The majority now says it was all a mistake.
I cannot pretend that the majority’s retreat from Lehmann will not have real-life negative consequences for the targets of workplace discrimination. Going forward, sexually harassed employees—mostly women—will be less likely to find relief in our courts, and therefore will be less likely to take their grievances there.[1] And employers will have less incentive to use greater care in selecting supervisors who will enforce rather than violate anti-discrimination policies. This is not a sky-is-falling prediction but a stark reality for anyone who understands what our jurisprudence was and what it has now become.
The Law Against Discrimination is one of New Jersey’s most progressive legislative schemes. Under the LAD, vicarious supervisory liability was a critical remedy both in making discriminated employees whole and in deterring workplace harassment. Because the majority has abandoned that remedy without any compensating benefit, I respectfully dissent.
I.
In our landmark decision in Lehmann, supra, 132 N.J. at 615-25, 626 A.2d 445, we set forth the different pathways for employer liability under our LAD when an employee is subjected to a hostile work environment through sexual harassment. In cases involving a hostile work environment persisting through an employer’s alleged negligence, we allowed for an employer to show that it exercised due care by effectuating an antidiscrimination policy accessible to employees. Id. at 621-22, 626 A.2d 445 (relying on Restatement (Second) of Agency § 219(2)(b) (1958)). However, we took a different approach when the supervisor was the perpe *533 trator of sexual harassment. In that circumstance, we clearly stated that an employer would be vicariously liable for the supervisor’s sexual harassment of a subordinate because the employer delegated to the supervisor the authority to control the workplace. Id. at 620, 626 A.2d 445 (relying on Restatement (Second) of Agency, supra, § 219(2)(d)). The employer could not seek cover behind an ineffective anti-discrimination policy that did not deter a supervisor from misusing the power delegated to him.
In Lehmann, we stated that whether an employer is liable for the hostile work environment created by a supervisor controlling the day-to-day activities of an employee depends on how a factfinder decides four questions:
1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains?
2. Did the supervisor exercise that authority?
3. Did the exercise of authority result in a violation of the LAD?
4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?

[Ibid.]

We further stated that “[w]hen the answer to each of those questions is yes, then the employer is vicariously liable for the supervisor’s harassment under § 219(2)(d).” Ibid. In supervisory liability cases, Lehmann posed no fifth question asking whether an employer should be excused because of a purportedly effective anti-discrimination policy available to its harassed employees.
Lehmann’s simple formulation of employer supervisory liability was understood by our courts and by various Supreme Court Committees given the task of preparing a jury charge consistent with our holding in Lehmann.
Writing for the Appellate Division in Schmidt v. Smith, 294 N.J.Super. 569, 578, 684 A.2d 66 (App.Div.1996), aff'd, 155 N.J. 44, 713 A.2d 1014 (1998), Judge Keefe noted that the “Lehmann Court provided a check list for the determination of whether a supervisor who creates a hostile work environment was aided in accomplishing that tort by the power delegated to him or her to control the day-to-day working environment.” Judge Keefe quot *534 ed the above four-question test in Lehmann and stated: “When the answer to each of these questions is yes, then the employer is vicariously liable for the supervisor’s harassment under § 219(2)(d).” Ibid, (citing Lehmann, supra, 132 N.J. at 619, 626 A.2d 445). Judge Keefe pointed out that unlike supervisory liability, the standard governing sexual harassment negligence claims allows an employer to present evidence of due care, such as “some effective preventative mechanisms such as anti-harassment policies, formal and informal complaint structures and monitoring mechanisms.” Id. at 579, 684 A.2d 66 (citing Lehmann, supra, 132 N.J. at 621, 626 A.2d 445).
The Supreme Court Model Civil Jury Charge Committee, comprised of preeminent judges and lawyers, has formulated and revised a supervisory-liability charge four times since 1997, each time asserting that an employer has no defense to a supervisor’s sexual harassment if the factfinder answers the four Lehmann questions in the affirmative. As recently as February 2013, the Model Civil Jury Charge Committee issued instructions on employer liability when a supervisor or non-supervisor creates the hostile work environment.[2] Civil Jury Charge 2.25 provides that an employer is liable “if it delegated to [the harassing supervisor] the authority to control the working environment and [the harassing supervisor] abused that authority to create a hostile work environment.” Model Jury Charge (Civil) 2.25(4)(b). The jury is (and has been) provided with the following instructions:
*535 To prove that defendant [employer’s name] is liable to plaintiff based on its delegation of authority to [name(s) of alleged harassing supervisor(s) ], plaintiff must prove each of the following elements by a preponderance of the evidence:
(1) That defendant I employer’s name] delegated authority to [name(s) of alleged harassing supervisor(s) ] to control the situation of which plaintiff complains; and
(2) Lname(s) of alleged harassing supervisor(s) ] exercised that authority; and
(3) [name(s) of alleged harassing supervisor(s) 1 exercise of authority resulted in unlawful harassment; and
(4) the authority delegated by defendant [employer name] to [name(s) of alleged harassing supervisor(s) ] aided [name(s) of alleged harassing supervisor(s) ] in harassing plaintiff.
If you find that the plaintiff has proved each of these elements, then defendant [employer’s name] is liable for the alleged unlawful harassment. If any one of these elements is not proved, then defendant [employer’s name] cannot be held liable based on its delegation of authority.
That charge has been given to juries for eighteen years. In Gaines v. Bellino, 173 N.J. 301, 313, 801 A.2d 322 (2002), we reaffirmed the basic formula found in this jury charge derived from Lehmann, never hinting that an affirmative defense applied to supervisory liability under the Restatement § 219(2)(d) approach. We did so even though Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662, 689 (1998) and Burlington Indus. v. Ellerth, 524 U.S. 742, 764-65, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633, 655 (1998), which provide an affirmative defense to supervisory liability, were both on the books. In Gaines, supra, we only stated that when an employee alleges employer negligence in causing a hostile work environment, under Restatement § 219(2)(b), the employer can assert the affirmative defense that it had an anti-discrimination policy in place. 173 N.J. at 313-14, 801 A.2d 322.
Moreover, that Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 120-21, 735 A.2d 548 (1999), permits an affirmative defense to a punitive-damage claim against a company in a LAD case, in no way contradicts Lehmann’s no-affirmative defense to a compensatory-damage claim involving supervisory liability, as the majority suggests. Nowhere in Cavuoti does the Court contravene the *536 supervisory-liability test for compensatory damages crafted in Lehmann.
Last, if Cavuoti and Gaines stood for the proposition that an affirmative defense applies to vicarious supervisory liability—as the majority asserts—then it stands to reason that this Court in 1999 and 2002 would have directed the Model Civil Jury Charge Committee to amend the Model Charge to conform to that view. But that never happened. Only now does the majority give the directive to the Committee to amend the Charge to include an affirmative defense.
II.
In Lehmann, swpra, we understood that we were pursuing our own path, a different path in construing the LAD as providing greater protection against workplace discrimination than that afforded by federal courts construing Title VII. 132 N.J. at 600-01, 603, 618-20, 626 A.2d 445. Indeed, we eschewed the standard set forth by the United States Court of Appeals for the Third Circuit for hostile work environment sexual harassment. Id. at 603, 626 A.2d 445. We stated:
[W]e announce a new test in the hope of creating a standard that both employees and employers will be able to understand and one that employers can realistically enforce. We cannot overstate the importance we place on a test that allows employees to know their rights in a given set of circumstances and that allows employers to set policies and procedures that comply with that test.

[Ibid.]

Importantly, in Lehmann, supra, we declined to follow the United States Supreme Court majority’s decision in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). 132 N.J. at 618-21, 626 A.2d 445. Meritor, supra, refused to accept the notion that “an employer is strictly liable for a hostile environment created by a supervisor’s sexual advances, even though the employer neither knew nor reasonably could have known of the alleged misconduct.” 477 U.S. at 69-70,106 S.Ct. at 2407, 91 L.Ed.2d at 61. Rather than follow Meritor, in Lehmann, supra, we cited approvingly Justice Marshall’s concurrence (joined *537 by Justices Brennan, Blaekmun, and Stevens) on supervisory liability:
[A] supervisor’s responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions. Rather, a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace. There is no reason why abuse of the latter authority should have different consequences than abuse of the former. In both cases it is the authority vested in the supervisor by the employer that enables him to commit the wrong: it is precisely because the supervisor is understood to be clothed with the employer’s authority that he is able to impose unwelcome sexual conduct on subordinates.
[132 N.J. at 618-19, 626 A.2d 445 (quoting Meritor, supra, 477 U.S. at 76-77, 106 S.Ct. at 2410, 91 L.Ed.2d at 65-66 (Marshall, J., concurring)).!
The United States Supreme Court in Faragher, supra, declared that it was bound to follow the majority decision in Meritor. 524 U.S. at 792, 118 S.Ct. at 2286, 141 L.Ed.2d at 679. However, as pointed out, in Lehmann, supra, we did not adopt the reasoning in Meritor. 132 N.J. at 618-21, 626 A.2d 445. Therefore, we are not bound to follow Faragher in lock-step.
Faragher, supra, held that an employer is subject to strict “vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee” when a tangible employment action is taken, “such as discharge, demotion, or undesirable reassignment.” 524 U.S. at 807-08, 118 S.Ct. at 2293, 141 L.Ed.2d at 689. On the other hand, “[w]hen no tangible employment action is taken”—for example, when the harassing conduct causes an employee to suffer a nervous breakdown or a severe psychiatric disorder—Faragher allows an affirmative defense. See id. at 807, 118 S.Ct. at 2293, 141 L.Ed.2d at 689. The affirmative defense comes into play if the employer can show “(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Ibid. The Court came to the same holding in Ellerth, supra, 524 U.S. at 764-65,118 S.Ct. at 2270,141 L.Ed. 2d at 655, which was decided on the same day as Faragher. *538 Until today, the Ellerth/Faragher affirmative defense standard was foreign to our LAD jurisprudence.
Lehmann makes no such distinction between tangible employment actions and sexual harassment that may cause physical or psychological harm to the employee. Under Lehmann, supra, so long as the “employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment,” the employer is liable for compensatory damages, whatever they may be. 132 N.J. at 624, 626 A.2d 445. Thus, a supervisor who sexually harasses and psychologically breaks an employee will be liable for compensatory damages. Ellerth/Faragher cannot be squared with Lehmann.
The United States District Court of New Jersey knew that our approach in Lehmann was incompatible with Ellerih/Faragher. In Newsome v. Administrative Office of the Courts, 103 F.Supp.2d 807 (D.N.J.2000), the plaintiff asserted violations of Title VII and the LAD, alleging that she was sexually harassed by her supervisor at the Administrative Office of the Courts (AOC). Even in the wake of Ellerih/Faragher, Judge Greenaway stated that “[a]l-though the New Jersey Supreme Court frequently looks to Title VII jurisprudence in interpreting the LAD, it has adopted a slightly broader test than that of the Third Circuit for hostile environment harassment.” Id. at 817 (citation omitted). Like Judge Keefe and the Supreme Court Model Civil Jury Charge Committee, Judge Greenaway read Lehmann as not providing an affirmative defense to supervisory liability for sexual harassment. Id. at 822. In a case in which an employer delegates to a supervisor the power to control the work environment, thus facilitating the harassing conduct, Judge Greenaway held that, under the LAD, “[t]he reasonableness of the AOC’s actions in implementing anti-harassment policies is no defense to harassment committed because of the agency relationship.” Ibid. Judge Greenaway stated that if a jury answered affirmatively that the supervisor’s actions “were sufficiently severe or pervasive to ere- *539 ate a hostile work environment” and that the supervisor “was able to commit those acts because of the authority delegated him by the AOC,” then “the AOC will be vicariously liable, irrespective of its anti-harassment policies.” Ibid.
Judge Greenaway understood Lehmann’s distinction between the LAD and Title VII’s approach to supervisory liability. It is that important distinction that the majority paves over today.
III.
Today’s decision is at complete odds with the widely held view that the LAD, under Lehmann, provided greater protection than federal law in hostile work environment cases.[3] “The LAD is remedial social legislation whose overarching goal is to eradicate the ‘cancer of discrimination.’ ” Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 108-09, 995 A.2d 1094 (2010). Before today, we heralded this state’s progressive anti-discrimination laws and jurisprudence. For example, in Alexander v. Seton Hall University, 204 N.J. 219, 222, 234-35, 8 A.3d 198 (2010), we refused to follow the United States Supreme Court’s crabbed “framework for analyzing accrual and timeliness in Title VII wage discrimination claims” in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, *540 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), because that framework disadvantaged employees who suffered discrimination. We rejected “the sea change that would be effected were we to adopt the Ledbetter majority approach to wage discrimination claims under our LAD” in light of our settled case law. Alexander, supra, 204 N.J. at 234, 8 A.3d 198. We therefore allowed for a more expansive statute of limitations under the LAD for the filing of wage discrimination claims. Ibid. Yet, the majority in this case invites a “sea change” that will disadvantage sexually harassed employees in the workplace.
If the United States Supreme Court’s interpretation of Title VII was not the gold standard in Alexander, then why here? First, the Ellerth/Faragher standard is not in keeping with our liberal construction of our LAD. See Nini, supra, 202 N.J. at 108-09, 995 A.2d 1094 (noting that LAD “should be liberally construed” because it “is remedial social legislation”). Second, the Ellerth/Faragher standard has received substantial criticism. One commentator has stated the Ellerth/Faragher standard creates a “risk that internal programs will be merely ‘symbolic responses—responses designed to create a visible commitment to law, which may, but do not necessarily, reduce employment discrimination.’” Melissa Hart, The Possibility of Avoiding Discrimination: Considering Compliance and Liability, 39 Conn. L.Rev. 1623, 1646 (2007) (quoting Lauren B. Edelman, Legal Ambiguity and Symbolic Structures: Organizational Mediation of Civil Rights Law, 97 Am. J. Soc. 1531, 1542 (1992)). Another commentator has expressed concern that “firms may utilize compliance systems simply as window-dressing to reduce the probability of legal liability without addressing the underlying behavior.” Timothy P. Glynn, Taking Self-Regulation Seriously: High-Ranking Officer Sanctions for Work-Law Violations, 32 Berkeley J. Emp. & Lab. L. 279, 312 (2011); see also Anne Lawton, Operating in an Empirical Vacuum: The Ellerth and Faragher Affirmative Defense, 13 Colum. J. Gender & L. 197, 199 (2004) (noting that United States Supreme Court’s approach “paved the way for the lower federal courts to interpret the affirmative defense in ways that further *541 undermine, rather than facilitate, the goal of deterring sexual harassment in the workplace”); John H. Marks, Smoke, Mirrors, and the Disappearance of “Vicarious” Liability: The Emergence of a Dubious Summary-Judgment Safe Harbor for Employers Whose Supervisory Personnel Commit Hostile Environment Workplace Harassment, 38 Hous. L.Rev. 1401, 1405 (2002) (stating that post-Ellerth courts are “manufacturing a dubious summary judgment safe harbor for employers”).
The Ellerth/Faragher standard, moreover, is not the optimal method for discouraging sexual harassment in the workplace. See, e.g., Susan Bisom-Rapp, Bulletproofing the Workplace: Symbol and Substance in Employment Discrimination Law Practice, 26 Fla. St. U.L.Rev. 959, 972 (1999) (“[T]he implementation of symbolic policies and procedures in no way guarantees substantive change for members of the groups that EEO law is designed to protect. In fact, symbolic policies and procedures may provide unjustified optimism that an organization is governed fairly.”); Joanna L. Grossman, The Culture of Compliance: The Final Triumph of Form, over Substance in Sexual Harassment Law, 26 Harv. Women’s L.J. 3, 71 (2003) (“Research suggests that the affirmative defense rewards compliance without ensuring success.”); Kimberly D. Krawiec, Organizational Misconduct: Beyond the Principal-Agent Model, 32 Fla. St. U.L.Rev. 571, 574 (2005) (“[Sjome organizations may employ internal compliance structures primarily as a window-dressing mechanism that provides both market legitimacy and reduced organizational liability for agent misconduct.”); Lawton, supra, 13 Colum,. J. Gender & L. at 198 (expressing concern that courts should not “reward employers for ‘file cabinet compliance.’ ”).
Clearly, Ellerth/Faragher is not offering a better way than Lehmann for the victims of hostile work harassment, whether those victims are targeted because of their gender, sexual orientation, race, religion, or nationality. If our civil jury charge on supervisory liability was so wrong because it gave victims of discrimination an unfair litigation advantage, one must wonder *542 why it took our Court eighteen years to say so. Moreover, had the Legislature wanted to include an affirmative defense to supervisory liability in the wake of Ellerth/Faragher, it could have amended the LAD. But it did not.
In short, neither precedent, nor experience, nor logic requires us to adopt a standard that is inferior to our own standard in Lehmann for supervisory liability in LAD hostile work environment cases.
IV.
Here are Aguas’s assertions, which we must accept as true for summary-judgment purposes. The highest-ranking officer on the third shift at the Edna Mahan Correctional Facility repeatedly sexually harassed Corrections Officer Ilda Aguas. On one occasion, the shift commander solicited Aguas to go with him to a motel; on another, he sat on her lap and blew his whistle while grinding his pelvis into her in the presence of two of Aguas’s supervisors.
In another incident, the shift commander pulled Aguas’s hands behind her back up to her shoulder blades, bent her over a table with his genital area touching her buttocks, stating ‘What are you going to do?” In yet another incident, the shift commander danced around Aguas and blew his whistle as though she were a stripper. Two superior officers were present but did not intercede. Other unwanted encounters included the shift commander massaging Aguas’s shoulders.
Aguas reported those egregious episodes of sexual harassment to a supervising lieutenant numerous times, and his response was that she should handle the matter herself. The supervising lieutenant took the position that he was “not going to lose [his] job by getting involved in this.” If Aguas’s account is true, the State is liable under Lehmann’s supervisory-liability standard, regardless of whether Aguas made a formal complaint pursuant to the Department of Correction’s anti-discrimination policy.
*543 Based on Aguas’s account, one fair inference is that a climate of fear discouraged the reporting of sexual harassment against a high-ranking officer. Common sense tells us that when the supervisor is the sexual harasser and other superior officers look the other way, as alleged here, the antidiscrimination policy touted by the employer has failed. The additional hoops that the majority requires Aguas to jump through under the Ellerth/Faragher standard do not advance the goals of the LAD, which is to rid the workplace of discriminatory harassment. This case exemplifies, if the allegations are true, how supervisory harassment can beat down and belittle an employee, who may understandably believe that she has nowhere to turn but to the courts.
V.
In the end, this is a case about statutory interpretation, and our mission is to construe the LAD consistent with the Legislature’s salutary goal of eradicating sexual harassment in the workplace. By imposing vicarious liability on the employer for a supervisor’s sexual harassment, the Lehmann Court gave effect to its understanding of the Legislature’s intent in passing the LAD. If the majority’s interpretation of the LAD is wrong, as I believe it is, the Legislature can still speak to the issue.
For reversal and remandment—Justices LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON and Judge CUFF (temporarily assigned)'—5.
For affirmance—Chief Justice RABNER and Justice ALBIN— 2.

 Lehmann ’s basic assumption is that women are the most frequent victims of sexual harassment in the workplace. See Lehmann, supra, 132 N.J. at 615, 626 A.2d 445.

 Model Jury Charge (Civil) 8.49, which instructs the jury on supervisory sexual harassment, was approved by the Supreme Court Model Civil Jury Charge Committee in October 1997. Model Jury Charge (Civil) 8.49 “Supervisory Sexual Harassment” (October 1997). Model Jury Charge (Civil) 2.25, which instructs the jury on hostile work environment claims under the LAD, was approved by the Supreme Court Model Civil Jury Charge Committee in November 1999. Model Jury Charge (Civil) 2.25. Then, in 2000, the Committee revised the charge, based on Lehmann. Notices to the Bar, Updates to Model Civil Jury Charges, 159 NJ.LJ. 258, 258 (Jan. 17, 2000). The charge was revised again, in February 2013, to "address an employer’s liability under the LAD for supervisory acts of sexual harassment.” Notices to the Bar, Model Civil Jury Charges Updates, 213 NJ.LJ. 554, 554 (Aug. 12, 2013).

 See Elliot M. Baumgarl & David H. Bcn-Asher, If You Don’t Have a Grievance Procedure, Get One; U.S. Supreme Court Lays Down the Rules for Avoiding Employer Liability for Sexual Harassment by Supervisors, 153 N.J.L.J. 492, 496 (Aug. 3, 1998) (“The discussion in Lehmann of an employer's effective complaint mechanisms took place only in the context of the negligence ground for vicarious liability, in contrast to Faragher and [Ellerth}—in which the existence oi a complaint mechanism is clearly available as a defense to all the grounds for vicarious liability."); Lisa Manshel, Employer Liability for Supervisors’ Sexual Harassment; Why Faragher and Ellerth Affirmative Defenses Shouldn’t Apply Under the LAD, 160 N.J.L.J. 609, 609 (May 15, 2000) (“The proponents of [Ellerth/Faragher] seek to use this affirmative defense to escape liability under the less forgiving test set forth in Lehmann.”); id. at 615 (“In actuality, the new affirmative defense is nothing more than a policy decision to shield employers from liability despite the fact that their policies are not effective. This federal policy contradicts the intent of the New Jersey Legislature as understood in Lehmann.”).